59 F.3d 793
 41 ERC 1678, 95 Cal. Daily Op. Serv. 5436,
95 Daily Journal D.A.R. 9272
 WASHINGTON STATE DEPARTMENT OF TRANSPORTATION,
Plaintiff-Appellant-Cross-Appellee,
v.
WASHINGTON NATURAL GAS COMPANY, PACIFICORP,
Defendants-Appellees-Cross-Appellants,
Advance Ross Corporation,
Third-Party-Defendant-Appellee-Cross-Appellant.
 Nos. 93-35088, 93-35130, 93-35137, 93-35289, 93-35292 and 93-35330.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 7, 1994.
Decided April 14, 1995.
As Amended July 13, 1995.
 
 Deborah L. Cade, Olympia, WA, for plaintiff-appellant-cross-appellee.
 Gregory Costello, Riddell, Williams, Bullitt & Walkinshaw, Seattle, WA, for defendant-appellee-cross-appellant, Washington Natural Gas.
 Louis A. Ferreira, Stoel, Rives, Boley, Jones & Grey, Portland, OR, for defendant-appellee-cross-appellant, Pacificorp.
 Peter Petrakis, Katten, Muchin & Zavis, Chicago, IL, for third-party-defendant-appellee-cross-appellant.
 Dennis J. Dunphy, Schwabe, Williamson, Ferguson & Burdell, Seattle, WA, for third-party-defendant-appellee-cross-appellant.
 Appeals from the United States District Court for the Western District of Washington.
 Before: TANG, BOOCHEVER, and REINHARDT, Circuit Judges.
 OPINION
 TANG, Senior Circuit Judge:
 
 
 1
 This is a review of several judgments of the United States district court, western district of Washington. The Washington State Department of Transportation (WSDOT) initiated this action against Washington Natural Gas Company (WNG), Pacificorp, and Advance Ross Corporation seeking recovery costs due under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. Sec. 9601, et seq. On cross-motions for partial summary judgment, the district court concluded that the defendants were responsible parties under CERCLA Sec. 107, 42 U.S.C. Sec. 9607. The district court conducted a bench trial to determine damages and entered a judgment in favor of WNG et al. The district court concluded that WSDOT was not entitled to recover its response costs because WSDOT did not comply with the National Contingency Plan ("NCP") promulgated by the Environmental Protection Agency ("EPA") pursuant to CERCLA.[1]
 
 
 2
 The overarching issue on this appeal is whether WSDOT can recover its response costs. To answer this question, we must address several related issues. First, under 42 U.S.C. Sec. 9607(a), is a state entitled to a presumption that its actions are consistent with the NCP? The effect of this presumption is to shift the burden of proving inconsistency with the NCP. We conclude that states are entitled to the presumption of consistency. Second, is WSDOT the "State" under 42 U.S.C. Sec. 9607(a)? We conclude that WSDOT is the "State," but further conclude that erroneously placing the burden of proof on WSDOT was harmless error. Third, were WSDOT's actions consistent with the relevant NCP, thereby entitling WSDOT to recovery of its response costs? We conclude that WSDOT's actions were inconsistent with the NCP and thus WSDOT is not entitled to recover its costs.[2]
 
 BACKGROUND
 
 3
 In 1982, WSDOT began construction of the Tacoma Spur, an interstate highway project designed to connect Interstate 5 to Schuster Parkway and downtown Tacoma, Washington. In late 1983 and early 1984, WSDOT's geotechnical consultant, the firm of Hart Crowser, discovered tar-like material in soil borings taken to gain information on the material that would support planned highway structures. WSDOT reported the contamination to the Washington State Department of Ecology ("WSDOE"). WSDOE tested soil samples using the persistence testing method, which tests for PAH compounds. Because these soil samples came from the geotechnical borings, they were not obtained utilizing protocol typically followed to gather environmental samples. WSDOE reported that the tarry material was contaminated with polycyclic aromatic hydrocarbons ("PAHs") at a level of greater than one percent. Under WSDOE's regulations, material with a concentration of PAHs greater than one percent is considered "extremely hazardous waste."
 
 
 4
 WSDOE advised WSDOT that it might try to get the site listed on the CERCLA National Priority List, to obtain funding through the Superfund program. According to Hart Crowser, WSDOT did not want to pursue that option because it involved extra time and effort. Neither Hart Crowser nor WSDOT referred to the CERCLA National Contingency Plan to determine how to proceed.
 
 
 5
 WSDOT hired Hart Crowser as an environmental consultant to investigate the site and determine the type and extent of subsurface contamination. Hart Crowser began its investigation in July, 1984. The firm discovered from historical records that a coal gasification plant had operated on the construction site from 1884 until 1924. Sanborn maps indicated the location of the gas holders used to store the manufactured gas. Hart Crowser assumed that the plant, along with any gas holders, had been removed because the plant was not visible.
 
 
 6
 Hart Crowser also learned that tar was a likely by-product of the coal gasification process and may have accumulated in gas holders. However, Hart Crowser expected that the tar had been removed because it had some commercial value. The firm also assumed that any remaining tar waste had been dumped on the extremities of the plant grounds. To avoid running into the foundations of the gas holders, Hart Crowser did not put borings into the area where the gas holders had been located.
 
 
 7
 In addition to conducting historical research, Hart Crowser drilled twenty-six borings and obtained 359 soil samples. Upon testing these samples, Hart Crowser identified two types of contaminated material: tar-like material, and oily silt and sand. Hart Crowser's tests indicated a PAH concentration under one percent in the tar-like material. The highest concentration of PAHs in one sample of tar-like material was .5 percent and the second highest was .15 percent. The concentration of PAHs in the oily silt and sand did not exceed .02 percent. Hart Crowser did not use the test WSDOE had used to identify PAHs--Hart Crowser's method did not test for the total PAH level. Therefore Hart Crowser's report relied on WSDOE's original tests to conclude that the tar may be classified as a hazardous waste by WSDOE standards.
 
 
 8
 Hart Crowser estimated the volume of the sub-surface contaminants by interpolating between the borings. The calculations yielded estimates that the site contained 40 to 100 cubic yards, a maximum of 100 tons, of coal tar and 4,500 to 6,000 cubic yards of oily silt and sand, a maximum of 10,000 tons. Hart Crowser issued a report containing its findings in November, 1984.
 
 
 9
 While Hart Crowser conducted its investigation, WSDOT organized an interagency team, consisting of representatives of WSDOT, WSDOE, and Hart Crowser, to discuss the action that needed to be taken. At various times, the team also included representatives of the Federal Highway Administration and the Tacoma-Pierce County Health Department.
 
 
 10
 After Hart-Crowser concluded the investigation, the interagency team met for several months to determine the appropriate course of action. The team concluded that all of the material had to be removed because it contained varying amounts of contamination. WSDOT recognized that the characterization of each of the two materials would have a major impact on the remedy selected and, therefore, the cost of removal. WSDOE considered the tar extremely hazardous waste under WSDOE regulations, based on its initial tests indicating a PAH concentration of greater than one percent. The team concluded that the only feasible option was to dispose of the tar at a hazardous waste facility in Arlington, Oregon. For the oily silt and sand, which was not considered a dangerous waste, the team considered the alternatives of on-site disposal, reuse, disposal at a landfill, disposal at the Arlington hazardous waste facility, and chemical treatment. Eventually the team decided to encapsulate the oily silt and sand in vaults on the site, an option considerably cheaper than disposal at Arlington.
 
 
 11
 Construction on the site began in September, 1985. In December, 1985, WSDOT's construction contractor discovered the remains of a large gas holder filled with a mixture of tar and other material. In February, 1986, the contractor unearthed the remains of an even larger gas holder, which was also filled with tar and other material, and a small pit filled with tar. The gas holders appeared to have been cut off at some level and then filled over.
 
 
 12
 WSDOT halted construction of the highway. Hart Crowser tested samples of the material in the second gas holder and in the tar pit using the persistence testing method WSDOE had used on the original contaminated samples. Samples taken from the tar pit area contained a PAH level of greater than one percent. Samples from the second gas holder contained PAH levels under one percent. The contents of the first holder had already been shipped and were never tested.
 
 
 13
 The team met frequently during this period and concluded that WSDOT needed to dispose of the tar-like material at Arlington. The team concluded that the volume of material did not affect the disposal options and therefore decided not to reexamine the options available to it. Construction had proceeded to a point that realigning the spur was not feasible. In addition, WSDOT faced the potential of significant cost increases for delays.
 
 
 14
 WSDOT's cleanup of the site was substantially completed by October, 1986, except for ongoing monitoring. Ultimately, 15,900 tons of coal tar were shipped to the landfill in Oregon, and 26,450 tons of oily silt and sand were encapsulated in concrete vaults on site.[3] Handling and disposal of the tar cost $4,000,000 while handling and containment of the oily silt and sand cost $550,000.
 
 
 15
 On August 4, 1989, WSDOT filed this action against the defendants to recover response costs under Sec. 107 of CERCLA. 42 U.S.C. Sec. 9607. WSDOT subsequently filed three motions for partial summary judgment,[4] and WNG et al. filed a joint motion for partial summary judgment.
 
 
 16
 The district court granted WSDOT's motion as to the liability of WNG et al. under CERCLA on the ground that each defendant was a responsible "person" under 42 U.S.C. Sec. 9607. The court stated that the defendants challenged liability only on the basis that WSDOT failed to comply with the NCP. However, failure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages. Cadillac Fairview/California Inc. v. Dow Chem. Co., 840 F.2d 691, 695 (9th Cir.1988). The district court concluded, therefore, that the defendants offered no valid reason to deny summary judgment on liability.
 
 
 17
 In its order, the district court also clarified legal standards applicable to the determination of damages. The district court concluded that WSDOT failed to qualify as a "State" under 42 U.S.C. Sec. 9607(a)(4)(A) and therefore carried the burden of proving that its actions were consistent with the NCP, pursuant to 42 U.S.C. Sec. 9607(a)(4)(B). The court added that WSDOT's actions would be evaluated for "substantial compliance" with the NCP. The court also decided that WSDOT's actions would be reviewed for compliance with the 1985 NCP, rather than the 1982 NCP, because WSDOT incurred over 95 percent of its response costs after publication of the 1985 NCP.
 
 
 18
 The district court reserved the issue of damages for a bench trial. On December 28, 1992, after the bench trial, the district court issued a memorandum opinion finding that WSDOT failed to substantially comply with the 1985 NCP. Accordingly, the court concluded that WSDOT was not entitled to damages.
 
 
 19
 Thereafter, each defendant filed a motion for attorney's fees pursuant to Fed.R.Civ.P. 37(c) and a bill of costs pursuant to Fed.R.Civ.P. 54(d), including the cost of depositions. The district court denied the motion for attorney's fees and granted the costs, except for the cost of obtaining depositions that had not been used at trial.
 
 
 20
 WSDOT appeals the district court judgment denying it damages. WNG, Pacificorp, and Advance Ross also appeal the court's judgments denying each of them attorney's fees and deposition costs.
 
 DISCUSSION
 
 21
 Congress enacted CERCLA, 42 U.S.C. Secs. 9601-9675, in December, 1980, "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. No. 1016(I), 96th Cong., 2d Sess. 22, reprinted in, 1980 U.S.Code Cong. & Admin.News 6119, 6125. Congress intended that CERCLA "facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes." U.S. v. R.W. Meyer, Inc., 889 F.2d 1497, 1500 (6th Cir.1989), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990) (internal quotation omitted).
 
 
 22
 The national contingency plan ("NCP"), promulgated by EPA as required by CERCLA Sec. 105, 42 U.S.C. Sec. 9605, guides federal and state response activities. Matter of Bell Petroleum Servs., Inc., 3 F.3d 889, 894 (5th Cir.1993). The NCP "provide[s] the organizational structure and procedures for preparing for and responding to ... releases of hazardous substances...." 40 C.F.R. Sec. 300.1. It "identifies methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities." Matter of Bell Petroleum Servs., Inc., 3 F.3d at 894.
 
 
 23
 This appeal involves interpretation of CERCLA Sec. 107, 42 U.S.C. Sec. 9607, which provides for the recovery of costs that a government or private party incurs in responding to the release of hazardous substances. Four categories of "persons," including owners and operators of hazardous waste sites, and generators and transporters of hazardous waste, are liable for:
 
 
 24
 (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]
 
 
 25
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....
 
 
 26
 42 U.S.C. Secs. 9607(a)(2), (a)(4)(A)-(B).
 
 
 27
 Section 9607(a) "functions to distinguish between government response costs in subsection (A) and private response costs in subsection (B)." Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 891 (9th Cir.1986). While the United States government, or a state or Indian tribe, can obtain "all costs of removal or remedial action ... not inconsistent with the [NCP]," any other person can obtain "other necessary costs of response ... consistent with the [NCP]. " (emphasis added). The language difference indicates that, when the United States government, a state, or an Indian tribe is seeking recovery of response costs, consistency with the NCP is presumed. United States v. Hardage, 982 F.2d 1436, 1442 (10th Cir.1992), cert. denied, Advance Chem. Co. v. United States, --- U.S. ----, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). Therefore, the potentially responsible party has the burden of proving inconsistency with the NCP. Id. at 1442; R.W. Meyer, Inc., 889 F.2d at 1508; United States v. Northeastern Pharmaceutical & Chem. Co. (NEPACCO), 810 F.2d 726, 747 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). In contrast, any "other person" seeking response costs under Sec. 9607(a)(4)(B) must prove that its actions are consistent with the NCP. Hardage, 982 F.2d at 1442.
 
 
 28
 I. Is WSDOT the "State" under Sec. 9607(a)(4)(A)?
 
 
 29
 WSDOT challenges the district court's summary judgment ruling that it does not qualify as a "State" under Sec. 9607(a)(4)(A). The district court's conclusion had the effect of denying WSDOT the presumption that its actions were consistent with the NCP. We review the district court's interpretation of Sec. 9607(a)(4)(A) de novo. United States v. Louisiana-Pacific Corp., 754 F.2d 1445, 1447 (9th Cir.1985). We conclude that WSDOT does fit within the statutory definition of a "State."
 
 
 30
 We begin with the definition set forth in CERCLA. "State" is defined to "include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction." 42 U.S.C. Sec. 9601(27). This definition does not explain what constitutes each of the "several States of the United States." A more detailed statutory definition was unnecessary because the plain meaning of "State" is the organized government acting on behalf of the citizens of the state. The plain meaning comports with the dictionary definition of "State:"
 
 
 31
 A people permanently occupying a fixed territory bound together by common-law habits and custom into one body politic exercising, through the medium of an organized government, independent sovereignty and control over all persons and things within its boundaries....
 
 
 32
 Black's Law Dictionary 1262 (5th ed. 1979) (emphasis added).
 
 
 33
 The organized government of a state includes state administrative departments and agencies. A "state agency" is "[a] department, commission, board, committee, or body of any form operating as an instrumentality of the state government." Ballentine's Law Dictionary 1210 (3d ed. 1969). The organized government of Washington state includes the Washington State Department of Transportation. WSDOT is the "State" for purposes of Sec. 9607.[5]
 
 
 34
 WNG et al. do not dispute that "State" includes state administrative agencies. Rather, WNG et al. attempt to limit the definition of "State" in Sec. 9607 to state agencies authorized to take removal or remedial action,[6] pursuant to 42 U.S.C. Sec. 9604. Section 9604 bars Superfund expenditures for remedial actions unless the state in which the release occurs enters into a cooperative agreement with the federal government. 42 U.S.C. Sec. 9604(c)(3). The state must agree to pay a portion of the remedial costs and to maintain cleanup actions initiated by the federal government. Id. In addition, Sec. 9604(d)(1) provides in relevant part:
 
 
 35
 Where the President determines that a State or political subdivision thereof has the capability to carry out any or all of the [removal or remedial] actions authorized in this section, the President may, in his discretion, enter into a contract or cooperative agreement with such State or political subdivision to take such actions....
 
 
 36
 In essence, WNG et al. argue that WSDOT should not be considered a "State" under Sec. 9607(a)(4)(A) because WSDOT did not act pursuant to authorization obtained from the federal government, i.e., the EPA.
 
 
 37
 The defendants' position is unfounded. Section 9607(a)(4)(A) expressly imposes liability on listed parties "notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b)."[7] The defendants' position, if adopted, would require that we read the "notwithstanding" clause out of the statute.
 
 
 38
 The argument of WNG et al. is also inconsistent with our analysis in Cadillac Fairview, involving private parties who sought response costs under Sec. 9607(a)(4)(B), in which we concluded that:
 
 
 39
 The absence of an approval or certification requirement in section 107(a) justifies the inference that parties not seeking reimbursement from the Superfund need not obtain prior governmental approval for their response action to be "necessary" or "consistent with the national contingency plan" under section 107(a).
 
 
 40
 840 F.2d at 694. Similarly, Sec. 9607(a)(4)(A) contains no requirement that a state obtain authorization from the federal government prior to engaging in response actions. States need not obtain EPA authorization to clean up hazardous waste sites and recover costs from potentially responsible parties. State of New York v. Shore Realty Corp., 759 F.2d 1032, 1047 (2d Cir.1985). "Section 107(a) was meant to stand by itself." United States v. Reilly Tar & Chem. Corp., 546 F.Supp. 1100, 1118 (D.Minn.1982); United States v. Wade, 577 F.Supp. 1326, 1335-36 (E.D.Pa.1983); State ex rel. Brown v. Georgeoff, 562 F.Supp. 1300, 1315 (N.D. Ohio 1983). Were we to adopt the strained definition of "State" set forth by the defendants, we would be creating an authorization requirement where none presently exists.
 
 
 41
 The district court concluded that the definition of "State" in Sec. 9607(a)(4)(A) did not include WSDOT, reasoning that WSDOT had no cleanup expertise and therefore was not entitled to a presumption that it acted consistently with the NCP. We reject this conclusion. Subsection (A) contains absolutely no language indicating that "State" is limited to agencies with special expertise. We cannot create such a limitation where none is provided by the statute.
 
 
 42
 The district court required WSDOT to proceed under Sec. 9607(a)(4)(B), which governs recovery of response costs incurred by "any other person." Because the district court applied subsection (B), WSDOT carried the burden of proving that its actions were consistent with the NCP. We have concluded that WSDOT is the "State" under subsection (A) and thus WNG et al. should have borne the burden of proving that WSDOT's actions were inconsistent with the NCP. Nonetheless, as we discuss in detail below, we conclude that ample evidence supports the district court's conclusion that WSDOT did not act consistently with the NCP. From our review of the entire record, we conclude it is clear that under the proper assignment of the burden of proof, the district court would have reached the same decision. Therefore, the district court's error was harmless. See Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1506 (1st Cir.1989); Smith v. United States, 590 F.2d 304, 305 (9th Cir.1979).II. Were WSDOT's actions "not inconsistent" with the NCP?
 
 
 43
 We evaluate consistency with the NCP by reviewing the actions of the party seeking response costs. See Hardage, 982 F.2d at 1443. The NCP is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment. If that party follows the detailed process set forth in the NCP, then its costs are not inconsistent with the NCP.
 
 
 44
 We have explained that the defendants carry the burden of proving that WSDOT's actions were inconsistent with the NCP, but have not yet discussed what the defendants must establish to carry this burden. To prove that a response action of the EPA was inconsistent with the NCP, a defendant must prove that the EPA's response action was arbitrary and capricious. Hardage, 982 F.2d at 1442; Meyer, 889 F.2d at 1508; NEPACCO, 810 F.2d at 748. This legal standard is justified " 'because determining the appropriate removal and remedial action involves specialized knowledge and expertise, [and therefore] the choice of a particular cleanup method is a matter within the discretion of the [government].' " Hardage, 982 F.2d at 1442 (quoting NEPACCO, 810 F.2d at 748). We need not determine whether WSDOE's involvement with WSDOT establishes agency expertise justifying application of the arbitrary and capricious legal standard, which is more deferential to WSDOT, or whether a legal standard less deferential to WSDOT should be employed. Even under the deferential arbitrary and capricious standard, we conclude that WSDOT's actions were inconsistent with the NCP.
 
 A. Applicable Version of the NCP
 
 45
 Before we review WSDOT's actions, we must determine which version of the NCP applies. The district court found that because WSDOT incurred 95 percent of its response costs after November 20, 1985, the date the 1985 NCP was published in the Federal Register, and because "guidance documents" on the 1985 NCP were available prior to November, the 1985 NCP applied "for all practical purposes." WSDOT argues that the district court erred in applying the 1985 version of the NCP, rather than the 1982 version, to costs incurred prior to publication of the 1985 NCP.
 
 
 46
 We look to the NCP that was in effect at the time that WSDOT incurred response costs, rather than to that in effect when WSDOT initiated its response actions. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir.1986); Wickland Oil, 792 F.2d at 891. WSDOT does not dispute that it incurred over 95 percent of its response costs after November 20, 1985. We conclude that the district court correctly applied the 1985 NCP to 95 percent of WSDOT's costs. We need not concern ourselves with the remaining five percent, however, because WSDOT's actions were inconsistent under either the 1982 or the 1985 version of the NCP. The district court's failure to apply the 1982 NCP to the remaining five percent of WSDOT's costs was harmless error.
 
 B. Consistency with the NCP
 
 47
 We now review WSDOT's action for compliance with the NCP, to determine whether WSDOT's actions were arbitrary and capricious.[8] WSDOT and its consultant, Hart Crowser, did not refer to the NCP for guidance on how to handle the contaminants on the site. WSDOT's lead representative on the coordination team handling the contamination project was not even aware that the NCP existed. Hart Crowser's project manager had never implemented the NCP in a remedial action. WSDOT's compliance with regulations that it did not consult is questionable. Nonetheless, an environmental cleanup could conceivably follow a standard procedure consistent with the NCP, even if the NCP is not actually referenced. Therefore we will evaluate WSDOT's actions under the standards set forth in the NCP.
 
 
 48
 Both the 1982 and the 1985 NCP require a remedial investigation "to determine the nature and extent of the threat presented by the release." 40 C.F.R. Sec. 300.68(d) (1986); 40 C.F.R. Sec. 300.68(f) (1984) (emphasis added). "This includes sampling, monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for and proposed extent of remedial action." Id. WSDOT's initial investigation, conducted by Hart Crowser, failed to determine either the nature or the extent of the threat posed.
 
 
 49
 Hart Crowser made several mistaken assumptions about the extent of the threat. Hart Crowser obtained a Sanborn insurance site map that showed the previous uses of the site. The map showed the location of a coal gasification plant that had once been on the site, [r212] as well as the location of gas holders used to store the manufactured gas. Hart Crowser assumed that the plant, including the gas holders, had been removed because the plant was not visible. However, Hart Crowser knew that the site was underlaid by fill--material placed above the naturally occurring material. Hart Crowser did not consider the possibility that only a portion of the plant had been removed, while the rest, including the remainder of the gas holders, had been filled in.
 
 
 50
 Additional mistakes contributed to miscalculation of the extent of the threat. Although Hart Crowser learned that tar, a by-product of gas, accumulates in gas holders, Hart Crowser expected that the tar had been removed because tar had some commercial value. Hart Crowser also assumed that unsold tar waste had been dumped on the extremities of the plant grounds, rather than near the plant. Finally, Hart Crowser did not put borings into the area where the gas holders had been located because it wanted to avoid running into the gas holder foundations.
 
 
 51
 Based on the site investigation, Hart Crowser estimated that 100 tons of tar-like material needed to be excavated. However, WSDOT's contractor eventually uncovered the lower sections of the gas-holders, which contained more tar-like material, as well as the tar pit. The tar material removed increased from the original estimate of 100 tons to a total of 16,000 tons.
 
 
 52
 In sum, WSDOT's remedial investigation utterly failed to determine the nature or the extent of the threat posed by the tar-like material. Hart Crowser drastically underestimated the amount of tar-like material on the site. Further, much of the tar-like material was classified as hazardous waste even though tests did not support this determination. The investigation did not provide "sufficient information to determine the necessity for and proposed extent of remedial action."
 
 
 53
 After setting forth standards for remedial investigation, the NCP sets forth detailed requirements on development and analysis of alternative courses of action. The NCP requires the party conducting the clean-up to develop several alternative courses of action, based on analysis of a number of factors including population, environmental and welfare concerns at risk; routes of exposure; amount, concentration, hazardous properties, environmental fate and transport and form of the substances present; hydrogeological factors; current and potential ground water use; climate, etc. 40 C.F.R. Sec. 300.68(e)(2)(i)-(xvii), (f)(2) (1986); 40 C.F.R. Sec. 300.68(e)(1)-(2), (g) (1984).
 
 
 54
 Next, the NCP requires an initial screening of alternatives, applying the criteria of cost, acceptable engineering practices, and effectiveness, to narrow the list of alternatives that will be subjected to a more detailed analysis. Rationale for eliminating alternatives must be documented. 40 C.F.R. Sec. 300.68(g) (1986); 40 C.F.R. Sec. 300.68(h) (1984). The NCP requires a much more detailed analysis of the remaining alternatives, including detailed specification of alternatives, detailed cost estimation, engineering evaluation, assessment of the extent to which the alternative will adequately protect public health and the environment, etc. 40 C.F.R. Sec. 300.68(h)(2)(i)-(vi) (1986); 40 C.F.R. Sec. 300.68(i)(2)(A)-(E) (1984).
 
 
 55
 WSDOT failed to satisfy these requirements. In the first investigation, prior to discovery of the additional tar, the interagency team informally considered several alternatives. In regard to the tar, testimony indicates that in situ treatment, which would effectively keep the material in place on site, was rejected because the material would not be removed. Incineration was rejected because of the expense. The record does not indicate that WSDOT subjected these alternatives to the kind of thorough analysis that the NCP requires. Hart Crowser's report to WSDOT does not contain a discussion of any of these alternatives. WSDOE's summary analysis states that disposal of the tar at Arlington is the only "feasible option" and does not indicate that other alternatives were even considered.
 
 
 56
 WSDOE's summary report indicates that the team gave more consideration to disposal of the oily silt and sand. The report discusses reuse, on-site disposal, landfill disposal, disposal at Arlington, and treatment. Although each alternative is discussed briefly, the interagency team did not follow the thorough requirements set forth in the NCP.
 
 
 57
 The interagency team fell particularly short when it failed to reevaluate alternatives after discovery of the additional tar. Analysis of alternatives follows assessment of the nature and extent of the problem. Once it became clear that the initial assessment grossly underestimated the amount of tarry material on the site, the team should have reconsidered the available alternatives. Instead, the team continued to rely on an analysis of alternatives designed to address a much smaller problem.
 
 
 58
 In the process of developing and screening alternatives, WSDOT also failed to address the import of tests indicating varying PAH levels in the tar-like material. Hart Crowser initially discovered the tar-like material during a geotechnical investigation, in soil borings taken to evaluate the type of material that would be supporting the Tacoma Spur. WSDOE tested samples of the tar using the persistence method, which tests for the total level of PAH compounds, and concluded that the tar contained a PAH level of greater than one percent. Under Washington regulations, this contamination level is classified as "extremely hazardous." However, the type of sampling protocol used in environmental investigations was not used for the samples removed during the geotechnical investigation.
 
 
 59
 During the subsequent environmental investigation, Hart Crowser tested additional soil samples, measuring the existence of specific PAH compounds rather than the total PAH level. However, WSDOT and the interagency team relied solely on the initial WSDOE tests in deciding that the waste needed to be disposed of at the Arlington facility. Had WSDOT followed the detailed requirements in the NCP to develop and analyze alternatives, its analysis would have indicated whether the concentration of PAH compounds made a difference in determining how to dispose of the contaminated material. See 40 C.F.R. Sec. 300.68(e)(2)(iii) (1986) (requiring that the concentration of the hazardous material be considered when developing alternatives); 40 C.F.R. Sec. 300.68(e)(2)(i)(B) (1984) (requiring that the amount and form of the substance present be considered).
 
 
 60
 Even after the additional material was discovered, WSDOT failed to consider the import of varying degrees of contaminant concentration. After the WSDOT's construction contractor unearthed the gas holder and tar pit, Hart Crowser conducted additional tests, including the persistence test that WSDOE had originally conducted. Samples taken from the tar pit area contained a PAH level greater than one percent. Samples from the gas holder contained PAH levels less than one percent. The contents of another gas holder had already been shipped and were never tested. Thus materials with varying concentrations of contaminants, and untested materials, were disposed of in the same manner without analysis of whether the varying concentrations warranted consideration of alternative disposal methods.
 
 
 61
 Finally, WSDOT failed to provide an opportunity for public review and comment of the alternative remedial measures it was considering. 40 C.F.R. Sec. 300.71(a)(2)(ii)(D), (1986). Although the public comment provision was not part of the 1982 NCP, it is contained in the 1985 NCP. WSDOT discovered the additional material after publication of the 1985 NCP and should have provided public comment after reevaluating the alternatives available to it.
 
 
 62
 Looking at the situation as a whole, we have no difficulty concluding that WSDOT's actions were inconsistent with the NCP. WSDOT failed to assess accurately both the nature and the extent of the threat posed by the presence of PAHs in the soil, failed to evaluate alternatives in the matter prescribed in the NCP, and failed to provide opportunity for public comment. Given the high degree of inconsistency with the requirements set forth in the NCP, WSDOT's action is arbitrary and capricious. Therefore, WSDOT is not entitled to recover its response costs under 42 U.S.C. Sec. 9607.
 
 
 63
 III. Should Defendants Receive Attorney's Fees and Deposition Costs?
 
 
 64
 Defendants WNG, Advance Ross, and Pacificorp each allege that the district court erred in denying their motions for attorney's fees pursuant to Fed.R.Civ.P. 37(c), and deposition costs pursuant to Fed.R.Civ.P. 54(d) and 28 U.S.C. Sec. 1920.
 
 A. Attorney's Fees
 
 65
 The district court denied payment of defendants' attorney's fees incurred to prove those matters that defendants had requested WSDOT to admit pursuant to Fed.R.Civ.P. 36(a).[9] Fed.R.Civ.P. 37(c) (1993), which governs the award of attorney's fees for failure to admit, provides in relevant part:
 
 
 66
 If a party fails to admit ... the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves ... the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.
 
 
 67
 We review a denial of attorney's fees under Rule 37(c) for abuse of discretion and will not reverse unless we have the "definite and firm conviction that the district court committed a clear error of judgment." Marchand v. Mercy Medical Center, 22 F.3d 933, 936 (9th Cir.1994).
 
 
 68
 In most of the requests for admission, WNG et al. asked WSDOT to admit that it had not complied with portions of the NCP. WNG asked WSDOT to admit that it did not conduct a remedial investigation/feasibility study to determine the nature and extent of the threat posed by release of the hazardous substances; conduct a scoping of response actions during the remedial investigation; develop alternative remedial actions; conduct an initial screening of alternatives; conduct a detailed analysis of alternatives; select a remedy pursuant to the NCP; or determine the extent to which federal environmental and public health requirements applied.
 
 
 69
 On the merits, we have concluded that WSDOT did not comply with the 1982 or the 1985 NCP. Nonetheless, attorney's fees may be denied if WSDOT had "reasonable ground to believe that [it] might prevail on the matter." Fed.R.Civ.P. 37(c)(3) (1993). The issue is not whether WSDOT prevailed at trial "but whether [it] acted reasonably in believing that it might prevail." Marchand, 22 F.3d at 937 (quoting advisory committee notes on 1970 amendment to Fed.R.Civ.P. 37).
 
 
 70
 Although the question is close, we conclude that WSDOT could have reasonably believed that it had complied with the applicable provisions of the NCP. Because WSDOT lacked expertise on environmental matters, it consulted with both WSDOE and a private consultant to test the material, determine the appropriate remedial action, and comply with applicable environmental law. At the most general level, WSDOT's actions follow the pattern set forth in the NCP. Hart Crowser conducted tests to determine the nature and extent of the remedial action and the interagency team at least informally evaluated several alternatives before it chose a course of action. Further, the questions of whether WSDOT was entitled to a presumption of consistency with the NCP, and the effect of that presumption, were unsettled. WSDOT could reasonably have believed that, with the benefit of the presumption, its actions would satisfy the requirements of the NCP. Thus, the district court did not abuse its discretion in denying the attorney's fees incurred to prove noncompliance with the NCP.
 
 
 71
 WSDOT also denied the requests to admit that the presence or release of coal tar and other wastes at the site did not pose an immediate and significant risk of harm to human life, health, or the environment. We conclude that attorney's fees with respect to these admissions were also properly denied. WSDOT reasonably believed that the tarry material posed a significant risk of harm. WSDOE tested the first material discovered and concluded that it constituted "extremely hazardous" waste because it contained a PAH level greater than one percent. Further, remedial actions under the NCP do not require a showing of "immediate" risk. Therefore, that portion of the request was "of no substantial importance." Fed.R.Civ.P. 37(c)(2) (1993). Finally, WSDOT denied a request to admit that it did not develop a formal community relations plan for the response action it undertook at the site. The NCP does not require such a showing for remedial actions. Therefore, this request was also "of no substantial importance."
 
 B. Deposition costs
 
 72
 The district court denied the portion of defendants' bill of costs requesting costs of depositions that were not used at trial. We review a denial of costs for abuse of discretion. Alflex Corp. v. Underwriters Lab., Inc., 914 F.2d 175, 176 (9th Cir.1990), cert. denied, 502 U.S. 812, 112 S.Ct. 61, 116 L.Ed.2d 36 (1991).
 
 
 73
 Fed.R.Civ.P. 54(d) and 28 U.S.C. Sec. 1920 allows the award of certain costs, including deposition costs, to the prevailing party. See Alflex Corp., 914 F.2d at 176-77. WNG et al. argue that the district court abused its discretion by denying deposition costs solely on the grounds that the depositions were not used at trial. Disallowance for expenses of depositions not used at trial is within the district court's discretion. Economics Laboratory, Inc. v. Donnolo, 612 F.2d 405, 411 (9th Cir.1979). The denial of depositions costs on those grounds was not an abuse of discretion.
 
 CONCLUSION
 
 74
 We AFFIRM the district court's decision that WSDOT failed to prove its case for damages. We also AFFIRM the court's decisions as to the defendants' claims for attorney's fees and deposition costs.
 
 
 
 [1]
 The district court's orders with respect to the partial motions for summary judgment, the bench trial, and defendants' motions for attorney's fees and deposition costs spurred four appeals and two cross-appeals to this Court
 WSDOT appeals the district court's judgment that WSDOT failed to comply with the NCP and was, therefore, not entitled to recover from WNG et al. WNG and Advance Ross cross-appeal the district court's ruling, on summary judgment, that each is a responsible party under CERCLA. Finally, WNG, Pacificorp, and Advance Ross appeal the district court's orders denying each of them attorney's fees under Fed.R.Civ.P. 37(c), and deposition costs under Fed.R.Civ.P. 54(d).
 
 
 [2]
 Because we affirm the district court's judgment that WSDOT is not entitled to recover its costs, we need not address whether WNG and Advance Ross are responsible parties
 
 
 [3]
 A significant portion of the oily silt and sand, thirty-two percent, came from an area outside the gasification plant site. By-products from a former gasoline station had contaminated this material
 
 
 [4]
 Only one of WSDOT's motions is relevant to this appeal
 
 
 [5]
 Some courts have concluded that the definition of "State" does not include political subdivisions such as municipalities. Town of Bedford v. Raytheon Co., 755 F.Supp. 469, 475 (D.Mass.1991); City of Philadelphia v. Stepan Chem. Co., 713 F.Supp. 1484, 1488-89 (E.D.Pa.1989). These cases are not relevant to the issue before us today. A municipality, a local government with authority over a limited area, is a different type of government unit than a state-wide agency that is part of the organized government of the state itself. Our discussion is limited to whether the definition of "State" encompasses the latter
 
 
 [6]
 CERCLA defines "remedial" actions essentially as long-term or permanent measures. "Removal" actions are generally those intended to be short-term measures. "Response" measures include both remedial and removal measures. 42 U.S.C. Sec. 9601(23), (24), and (25)
 
 
 [7]
 The defenses listed in Sec. 9607(b) are not at issue
 
 
 [8]
 We review de novo the district court's legal conclusion. Louisiana-Pacific Corp., 754 F.2d at 1447. Because the district court in the present case applied Sec. 9607(a)(4)(B) rather than Sec. 9607(a)(4)(A), the court applied the wrong legal standard--whether WSDOT had "substantially complied" with the NCP. We need not remand for application of the correct legal standard because we do not owe deference to the district court's conclusions of law. Therefore, we proceed to determine whether WSDOT's actions were arbitrary and capricious
 
 
 [9]
 Fed.R.Civ.P. 36(a) provides in relevant part:
 A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters ... set forth in the request that relate to statements or opinions of fact or of the application of law to fact....