**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARSON HARBOR VILLAGE, LTD., a
limited partnership dba Carson
Harbor Village Mobilhome Park,
　　　　　*Plaintiff-counter-*
　　　　　*defendant-Appellant,*

v.

COUNTY OF LOS ANGELES; CITY OF
COMPTON; CITY OF CARSON,
　　　　　*Defendants-counter-*
　　　　　*claimants,*

CARSON HARBOR VILLAGE MOBILE
HOME PARK, a California general
partnership; RICHARD G. BRALEY;
WALKER SMITH, JR.,
　　　　　*Defendants-cross-*
　　　　　*claimants,*

　　　　　and

UNOCAL CORPORATION, a Delaware
Corporation,
　　　　　*Defendant-cross-*
　　　　　*claimant-Appellee.*

No. 04-55024

D.C. No.
CV-96-03281-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
October 17, 2005—Pasadena, California

Filed January 12, 2006

507

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain, and Richard A. Paez, Circuit Judges.

Opinion by Judge Hall

**COUNSEL**

Thomas W. Casparian, Gilchrist & Rutter, Santa Monica, California, and Chris M. Amantea, McDermott, Will & Emery, Los Angeles, California, for the appellant.

Kurt Weissmuller, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Los Angeles, California, for the appellee.

**OPINION**

HALL, Senior Circuit Judge:

Plaintiff Carson Harbor Village, Ltd. (Carson Harbor) appeals the district court's grant of summary judgment for Defendant Unocal Corporation (Unocal) denying Carson Harbor recovery of cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq*. Carson Harbor argues there are genuine issues of material fact regarding whether it substantially complied with the National Oil and Hazardous Substances Pollution Contingency Plan (National Contingency Plan). Carson Harbor also appeals the district court's exclusion of proffered documentary evidence, arguing that it

was properly authenticated and that the district court abused its discretion in not considering late-filed declarations.

The district court had jurisdiction pursuant to 42 U.S.C. § 9613. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm summary judgment for Unocal.

## I.  BACKGROUND

### A.  Facts

Carson Harbor is a limited partnership owned by James Goldstein and his corporation, Goldstein Properties, Inc., of which he is the sole shareholder and president. Carson Harbor has owned the Carson Harbor Village Mobile Home Park (the Property) in Carson, California since 1983. In the past, the Property had been used as a dairy farm and for oil production and storage. Unocal held an oil and gas lease in the Property from 1945 until 1977, when the Property was converted into a mobile home park. Included within the Property boundaries are about seventeen acres of marshy wetlands, crossing the Property with a downward slope from northeast to southwest.[1]

Carson Harbor first discovered tar-like and slag material in the wetlands on the Property in 1994. The tar-like material was visible at the surface and covered an area about twenty feet by thirty feet in the wetlands. Later excavation revealed that the tar-like material actually covered an area about 170 feet long by 75 feet wide, with depths ranging from one to five feet. The slag varied in size and depth, but was most concentrated near the tar-like material. In 1994, Carson Harbor hired McLaren-Hart, a national environmental engineering consulting firm, to investigate the pollution at the Property.

---

[1]Carson Harbor asserts that the area is a federally protected wetlands. However, as the district court properly noted, that contention is not relevant to the outcome of the issues presented to this court and need not be decided.

McLaren-Hart collected and analyzed samples of the tar-like and slag materials to determine their components and found lead concentrations well above allowable levels in California.

As required by law, Carson Harbor notified the Regional Water Quality Control Board (RWQCB) of the high lead concentrations. Additionally, on June 8, 1994, Carson Harbor notified residents of the mobile home park of the pollution at the Property. A letter was sent out alerting the residents that high concentrations of lead were found in the wetlands. The letter stated that residents were being given this notice "as required by [California] Proposition 65."

On behalf of Carson Harbor, McLaren-Hart engaged in a series of communications with the RWQCB about the pollution at the Property. Specifically, McLaren-Hart employees met with RWQCB representatives on August 28, 1994, and representatives of the RWQCB visited the Property and later discussed that visit with McLaren-Hart. On January 27, 1995, McLaren-Hart sent the RWQCB a proposed remedial action plan for approval. After making minor modifications to the proposed remedial action plan,[2] the RWQCB approved the remedial action plan on February 27, 1995.

The remedial goals for the Property outlined in the remedial action plan were to remove all the tar-like and slag material, if possible; to ensure the removal did not endanger public health and safety or the environment; and to ensure the removal met standards of the RWQCB and other involved agencies. The only remedial measure addressed by McLaren-Hart in the remedial action plan was removal of the tar-like

---

[2]The RWQCB required McLaren-Hart to perform the excavation during dry weather; indicated that the slag material may be hazardous waste and should be disposed of accordingly; affirmed that the cleanup criteria listed in the remedial action plan were consistent with RWQCB requirements; and stated that "gently sloping walls" would not be required in connection with the backfilling plan.

and slag materials to decrease the concentration of pollutants in the soil. There is no hint in the remedial action plan that McLaren-Hart considered other possible remedial measures. The sole indication that other options were considered is the declaration of one of Carson Harbor's experts, Dr. Hassan Amini, filed in opposition to Unocal's summary judgment motion. Dr. Amini worked for McLaren-Hart during the remedial action at the Property. In his declaration, he stated that "[McLaren-Hart] considered various alternatives for remediating the tar and slag material from the wetlands, including the alternative of leaving the material in place."

Unocal was first notified of pollution at the Property on March 10, 1995. Richard Close, Carson Harbor's counsel at the time, sent a letter to Unocal stating that Carson Harbor intended to hold Unocal responsible for the pollution and requesting Unocal's assistance in the remedial action. Internal memoranda from Unocal indicate that there had been numerous spills in the polluted area, at least one of which was from Unocal's operations. Initially, Unocal indicated that because of the sensitive nature of the wetlands "it seems unreasonable to do anything but document [the pollution] and leave it." Later, Unocal acknowledged that McLaren-Hart would remove the tar-like and slag material from the wetlands.

Carson Harbor sent a letter to the mobile home park residents on July 5, 1995, notifying them that removal of tar-like materials in the wetlands would begin on July 17, 1995. On July 7, 1995, Close sent a similar letter to both State Senator Ralph Dills, whose office had been involved in planning the remediation efforts, and to the RWQCB.[3]

---

[3]All of these letters, as well as the letter which initially notified Unocal of the pollution at the Property, were exhibits attached to the disputed Casparian Declaration. The other letters attached to the Casparian Declaration were communications between Carson Harbor's former counsel Richard Close, Carson Harbor's agent Ken James, representatives of oil companies that are or were associated with the Property, the Los Angeles

During the remedial action,[4] a total of 1,042 tons of mate-

Public Works Department, the County of Los Angeles Board of Supervisors, the Los Angeles County Flood Control District, McLaren-Hart, the RWQCB, the U.S. Army Corps of Engineers, the California Department of Transportation, Unocal, the City of Carson, the California Department of Fish and Game, the City of Compton, the County of Los Angeles, and state Senator Dills.

The Casparian Declaration was filed on June 3, 2003, in opposition to Unocal's motion for summary judgment, filed on May 19, 2003. One day prior to the scheduled hearing on the summary judgment motion, Carson Harbor received the tentative ruling of the district court excluding the Casparian Declaration for improper authentication. On the day of the hearing, just prior to its beginning, Carson Harbor offered declarations from its former attorney, Richard Close, and from Dr. Amini, each authenticating certain letters attached to the original Casparian Declaration to which they were a party. The district court declined to consider the late-submitted declarations and ultimately excluded the majority of the exhibits attached to the Casparian Declaration as well.

We review that decision for an abuse of discretion. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). In this case, Casparian did not have any personal knowledge of the disputed documents, was not a party to any of the letters, and offered the district court no other explanation of how he could authenticate the documents. As a result of this lack of authentication, the district court was well within its discretion to refuse to admit the evidence, and we affirm its decision.

Carson Harbor also argues that the district court should have considered the additional declarations of Dr. Amini and Richard Close, submitted on the day of the hearing, which purportedly provided proper authentication of the disputed documents. While Carson Harbor's deadline for filing its opposition to Unocal's summary judgment motion was shortened somewhat by the district court, Carson Harbor still did not submit the supplemental Amini and Close declarations in a timely fashion. Instead, it waited until the day of the hearing, after it had received a copy of the district court's preliminary ruling excluding the Casparian Declaration. The district court was not required to consider the late-submitted declarations and it did not abuse its discretion by refusing to do so.

[4]The district court found that Carson Harbor's action here was a remedial action, requiring compliance with more stringent National Contingency Plan requirements, not a removal action, and Carson Harbor has not challenged that finding on appeal.

rial were excavated and transported offsite for disposal. On October 11, 1995, after the remediation was complete, McLaren-Hart sent the RWQCB a clean closure report dated September 13, 1995. The RWQCB replied with a "no further action" letter on October 18, 1995, after its staff inspected the Property to ensure the remedial action was successfully completed.

## B.  Procedural History

On May 7, 1996, Carson Harbor filed suit against Unocal, various local governments, and the prior owners of the Property seeking damages under CERCLA, the Resource Conservation and Recovery Act, the Clean Water Act, and various state laws including nuisance, indemnity, and negligent nondisclosure. On November 7, 1997, then-District Judge Kim McLane Wardlaw granted summary judgment in favor of all defendants on all claims except some state law claims not relevant here. *Carson Harbor Village, Ltd. v. Unocal Corp.*, 990 F.Supp. 1188, 1199 (C.D. Cal. 1997). A Ninth Circuit panel partially reversed summary judgment on the CERCLA claim. *Carson Harbor Village, Ltd. v. Unocal Corp.*, 227 F.3d 1196 (9th Cir. 2000), *superseded by Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) (en banc) (*Carson Harbor I*). The *en banc* court reversed summary judgment in favor of Unocal on the CERCLA claim and remanded for a determination of whether Carson Harbor substantially complied with the National Contingency Plan and could therefore recover against Unocal under CERCLA. *Carson Harbor I*, 270 F.3d at 873. On remand, District Judge Margaret M. Morrow granted summary judgment in favor of Unocal on the CERCLA claim, holding that Carson Harbor failed to show there were genuine issues of material fact regarding whether its remediation substantially complied with the National Contingency Plan public participation and feasibility study requirements. *Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F.Supp.2d 1118, 1172, 1204 (C.D. Cal. 2003) (*Carson Harbor II*).

The district court's grant of summary judgment is reviewed *de novo*. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002). Viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in its favor, we must determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Id*.

## II.   DISCUSSION

### A.   National Contingency Plan Compliance

**[1]** CERCLA, 42 U.S.C. § 9601 *et seq*., was enacted in 1980 "to provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. No. 96-510, 94 Stat. 2767 (1980). CERCLA contains a provision, 42 U.S.C. § 9607(a), which allows private parties who incur cleanup costs to recover those costs from "various types of persons who contributed to the dumping of hazardous waste at a site." *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152 (9th Cir. 1989). To establish a *prima facie* case under § 9607(a), the plaintiff must show that (1) the property at issue is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" has occurred; (3) the "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a). *Ascon Properties*, 866 F.2d at 1152. Private parties have the burden of proving that cleanup costs associated with remedial actions are consistent with the National Contingency Plan to recover those cleanup costs under CERCLA. 42 U.S.C. § 9607(a)(4)(B); *Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 800 (9th Cir. 1995).

**[2]** The National Contingency Plan is promulgated by the Environmental Protection Agency pursuant to CERCLA. 42 U.S.C. § 9605. *See generally* 40 C.F.R. Part 300. The National Contingency Plan outlines specific steps parties must take in choosing a remedial action plan and cleaning up hazardous waste. It is "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *Washington State*, 59 F.3d at 802. Private party remedial action is "consistent with the [National Contingency Plan] if the action, when evaluated as a whole, is in *substantial compliance* with . . . [certain procedural requirements], and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i) (emphasis added). Relevant to this appeal, the National Contingency Plan requires that the party seeking recovery provide an opportunity for public comment and participation, conduct a remedial site investigation, and prepare a feasibility study. 40 C.F.R. §§ 300.700(c)(5)(vii)-(viii), (c)(6).

### 1.  Public Participation Requirement

The public participation requirement has two main components. First, in developing a remedial action plan, prior to actual field work beginning, the party conducting the cleanup "shall . . . to the extent practicable" interview local officials, community residents, or other interested or affected parties to learn their concerns. 40 C.F.R. § 300.430(c)(2)(i). Additionally, a formal community relations plan must be prepared to ensure an opportunity for public involvement, and at least one local "information repository" must be established to make information available to the public about the site remediation. 40 C.F.R. § 300.430(c)(2)(ii). Second, after a remediation plan has been chosen, the party conducting the cleanup shall publish notice of the plan in a local newspaper, provide an opportunity for submission of comments on the proposed plan, provide an opportunity for a public meeting, make a transcript of the meeting available to the public, and prepare

a written summary of significant comments and responses to those comments. 40 C.F.R. § 300.430(f)(3).

[3] Carson Harbor did not itself comply with the public participation requirement of the National Contingency Plan during its remedial action.[5] Rather, it argues that the public participation requirement is satisfied because of the "substantial involvement" of the overseeing governmental unit, the RWQCB. Several other courts, and the district court below, have held that "participation by a public agency is sufficient to demonstrate compliance with the [National Contingency Plan] public comment requirement." *Carson Harbor II*, 287 F.Supp.2d at 1162 (citing *Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2d Cir. 1998)); *see also Norfolk S. Ry. Co. v. Gee Co.*, 158 F.Supp.2d 878, 883 (N.D. Ill. 2001); *Am. Color & Chem. Corp. v. Tenneco Polymers, Inc.*, 918 F.Supp. 945, 957 (D.S.C. 1995). Our circuit has not decided if significant agency involvement can satisfy the National Contingency Plan's public participation requirement, and we need not decide that issue of first impression to resolve this case. Even if significant agency involvement were enough to satisfy the National Contingency Plan's public participation requirement,

---

[5]The district court correctly noted that there is no evidence in the record that Carson Harbor prepared a community relations plan, that the public was given notice of the remedial action, that the remediation plan was published or otherwise made available to the public, that any public meeting was held, or that any other opportunity for public comment was given. There is evidence in the record that Carson Harbor notified local officials and other interested parties, including Unocal. Additionally, meetings were held with representatives from Carson Harbor, Unocal, the RWQCB, and state Senator Dills's office to discuss the Property and remediation efforts. However, this alone does not create a genuine issue of material fact as to whether Carson Harbor substantially complied with the public participation requirement of the National Contingency Plan because there was never an opportunity for the public at large to comment on the plan. The best evidence of this is that local residents had to go to their state senator, Dills, to raise their concerns about the pollution at the Property and its remediation.

the involvement of the RWQCB in this case is insufficient to do so.

In *Bedford Affiliates*, the Second Circuit held that "extensive involvement of a government agency charged with the protection of the public environmental interest is an effective substitute for public comment." 156 F.3d at 428. In that case, the agency had been "actively involved" in the cleanup for four years and had negotiated a consent order with Bedford. *Id.* at 428. Additionally, the agency in *Bedford Affiliates* was present to "investigate the implementation of the preliminary site assessment and the interim remedial measure." *Id.* The agency also negotiated a second consent order with Bedford in 1995, and the cleanup was conducted "[u]nder the supervision of the [agency]." *Id.* at 422. Under those facts, the Second Circuit held that "[w]here a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement." *Id.* at 428.

The facts before us in this case do not constitute active participation by the RWQCB which could fulfill the public comment requirement of the National Contingency Plan. In this case, the RWQCB was involved in a very limited fashion. It was not present when Carson Harbor did a preliminary investigation of the pollutants at the Property, as was the agency in *Bedford Affiliates*. Furthermore, the RWQCB was not actively involved in the remedial action at the Property. While representatives from the RWQCB did visit the Property and participate in meetings concerning the pollution at the Property, it did not take a lead role like the agency in *Bedford Affiliates* which negotiated two consent decrees. The RWQCB merely approved McLaren-Hart's proposed remedial action plan, with very minor modifications. Additionally, the RWQCB did not oversee the cleanup like the agency in *Bedford Affiliates* did, but merely inspected the Property after cleanup was complete to verify that McLaren-Hart had complied with the

remedial action plan. Even if we adopted the rule in *Bedford Affiliates* that significant government agency involvement fulfills the public participation requirement of the National Contingency Plan, the minor and ministerial involvement by the RWQCB in this case would not suffice to be an effective substitute for public participation.[6]

### 2.   Remedial Investigation and Feasibility Study Requirements

The purpose of the remedial investigation is to "collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.430(d)(1). The remedial investigation determines the nature and extent of the problem at the site. 40 C.F.R. § 300.5. The data collected during the remedial investigation is used during the feasibility study to develop and evaluate options for a remedial plan. *Id*. The purpose of the feasibility study is to "ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected." 40 C.F.R. § 300.430(e)(1).

The remedial investigation requires the party conducting the cleanup to assess threats to human health or the environment, consider the physical characteristics of the site, the type of pollution involved, the extent to which the source of the pollution can be identified, potential pathways for exposure to the pollution, and various other factors potentially relevant to the analysis of remedial measures. 40 C.F.R. § 300.430(d)(1)-(4). The feasibility study is prepared using data collected dur-

---

[6]Carson Harbor's argument that the public participation requirement can be satisfied if the exhibits to the excluded Casparian Declaration are admitted is unavailing. Those exhibits are simply letters between various involved parties, *see supra* note 3, and do nothing to establish that the RWQCB was significantly involved in the cleanup at the Property.

ing the remedial investigation. In developing a remedial plan, both the purpose of the plan and the potential methods for achieving that objective must be considered. 40 C.F.R. § 300.430(e)(2)-(6). Each potential plan must be assessed for effectiveness in achieving the stated objective, ease of implementation, and cost. 40 C.F.R. § 300.430(e)(7). Finally, the feasibility study must include "a detailed analysis . . . on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage." 40 C.F.R. § 300.430(e)(9).

**[4]** As recognized by the court below, Carson Harbor arguably conducted a remedial investigation that substantially complied with the National Contingency Plan. McLaren-Hart analyzed the physical characteristics of the Property, determined the level and kind of pollutants present, and to some extent, determined the potential source of the pollutants. Even though no public health assessment was conducted, only substantial compliance is required to satisfy the National Contingency Plan, and Carson Harbor meets that standard as to the remedial investigation.

**[5]** As to the feasibility study, however, Carson Harbor has not demonstrated substantial compliance with the National Contingency Plan. In arguing that it has complied with the feasibility study requirement, Carson Harbor relies almost solely on its remedial action plan and on Dr. Amini's declaration submitted in opposition to Unocal's summary judgment motion. The remedial action plan submitted to the RWQCB has a full analysis of only one alternative: removal. The remedial action plan discusses the remediation goals, the process for removal, and the pollutant levels required after remediation to be safe for human health and the environment. However, discussing a single remediation alternative does not establish substantial compliance with the feasibility study requirements of the National Contingency Plan. One of the hallmarks of the feasibility study requirement is assessing a variety of possible alternatives and providing analysis of the

costs, implementability, and effectiveness of each, and choosing the best alternative for the site at issue. In this case, Carson Harbor failed to consider any option other than removal of the tar-like and slag materials.

**[6]** The only evidence Carson Harbor puts forth to show that it considered other options is the declaration of its consultant, Dr. Amini, stating that "[a]t the time, [McLaren-Hart] considered various alternatives for remediating the tar and slag material from the wetlands, including the alternative of leaving the material in place." This statement alone, with no records or other evidence whatsoever to support it, is not sufficient to show that Carson Harbor substantially complied with the feasibility study requirement of the National Contingency Plan.

**[7]** Carson Harbor also argues that removal was the only viable remediation alternative and that it was therefore not required to consider other alternatives. We have previously rejected this argument in a factually similar case, *Washington State*, 59 F.3d 793. In *Washington State*, we held insufficient for National Contingency Plan compliance "summary analysis [which] states that disposal of the tar at Arlington is the only 'feasible option' and does not indicate that other alternatives were even considered." 59 F.3d at 804. The facts in this case are nearly identical to those in *Washington State*. Here, Carson Harbor's remedial action plan only discusses removal of the tar-like and slag material, and does not address any other alternatives. Additionally, as in *Washington State*, there is no assessment of the chosen removal alternative in the remedial action plan in terms of effectiveness, cost, or ease of implementation. Carson Harbor has not shown that there are genuine issues of material fact remaining on the issue of whether it substantially complied with the feasibility study requirement of the National Contingency Plan. Therefore, the district court correctly held that Unocal is entitled to summary judgment as a matter of law on this issue.

## III. CONCLUSION

Carson Harbor has failed to put forth sufficient evidence to show there remain genuine issues of material fact regarding whether it substantially complied with the public participation and feasibility study requirements of the National Contingency Plan. Carson Harbor afforded the public no opportunity to comment on, or even learn of, the proposed remediation plan. The slight involvement of the RWQCB in overseeing and approving the cleanup does not act as an effective substitute for Carson Harbor's failure here. Additionally, Carson Harbor utterly failed to produce any evidence that it in any way complied with the feasibility study requirement of the National Contingency Plan. The sole indication that any alternatives besides removal were considered is Dr. Amini's declaration that McLaren-Hart had thought about other options. This alone does not substantially comply with the feasibility study requirement of the National Contingency Plan. Carson Harbor did not substantially comply with the National Contingency Plan, and the district court correctly held that Unocal is entitled to summary judgment.

**AFFIRMED.**