**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SANTA CLARITA VALLEY WATER AGENCY, | No. 22-55727 |
| *Plaintiff-Appellee,* | D.C. No. 2:18-cv-06825-SB-RAO |
| v. | |
| WHITTAKER CORPORATION, | OPINION |
| *Defendant-Appellant,* | |
| and | |
| DOES, 1-10, inclusive, | |
| *Defendant,* | |
| v. | |
| KEYSOR-CENTURY CORPORATION, a California corporation; SAUGUS INDUSTRIAL CENTER, LLC, a Delaware limited liability company, | |
| *Third-party-defendants.* | |

SANTA CLARITA VALLEY
WATER AGENCY,

*Plaintiff-Appellant*,

v.

WHITTAKER CORPORATION,

*Defendant-Appellee*,

and

DOES, 1-10, inclusive,

*Defendant*,

v.

KEYSOR-CENTURY
CORPORATION, a California
corporation; SAUGUS INDUSTRIAL
CENTER, LLC, a Delaware limited
liability company,

*Third-party-defendants*.

Nos. 22-55754
22-56043

D.C. No.
2:18-cv-06825-
SB-RAO

Appeal from the United States District Court
for the Central District of California
Stanley Blumenfeld, Jr., District Judge, Presiding

Argued and Submitted January 11, 2024
Pasadena, California

Filed April 15, 2024

Before:  Richard C. Tallman, Consuelo M. Callahan, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY[*]

### Environmental Law

The panel affirmed in part and reversed in part the district court's judgment, after a combined jury and bench trial, against Whittaker Corp. in an action brought under the Comprehensive Environmental Response, Compensation, and Liability Act, the Resource Conservation and Recovery Act, and California state law by Santa Clarita Valley Water Agency.

SCVWA, a public water agency, alleged that Whittaker was responsible for contamination of groundwater that the agency pumps from wells.  The jury found Whittaker liable for negligence, trespass, public nuisance, and private nuisance, and awarded damages for past harm and restoration or repair costs.  The jury verdict was reduced to $64,870,000, reflecting a 10% reduction due to SCVWA's

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

fault for failure to mitigate damages and an offset for a settlement between SCVWA and a third party. Following a bench trial on the statutory claims, the district court denied SCVWA relief under RCRA and apportioned costs under CERCLA to SCVWA and Whittaker.

Affirming the jury award on Whittaker's appeal, the panel held that the district court did not abuse its discretion by permitting SCVWA to assert restoration costs as a measure of damages for the first time after the close of discovery, SCVWA adequately established that groundwater treatment facilities were an appropriate measure of damages, and the jury award of restoration costs was reasonable.

On SCVWA's cross-appeal, the panel affirmed in part, holding that the district court's denial of injunctive relief under RCRA, denial of prejudgment interest, and denial attorneys' fees were proper. Reversing in part, the panel held that the district court erred in denying SCVWA a finding of liability against Whittaker for one category of incurred response costs under CERCLA. The panel also held that the district court erred by denying SCVWA declaratory relief under CERCLA. The panel remanded for the district court to amend its judgment.

## COUNSEL

Jennifer L. Meeker (argued), Frederic A. Fudacz, and Byron Gee, Nossaman LLP, Los Angeles, California; Daniel P. Costa, Gurnee Mason Rushford Bonotto & Forestiere LLP, Roseville, California; Patrick J. Richard and Ilse C. Scott, Nossaman LLP, San Francisco, California; for Plaintiff-Appellee.

Mark E. Elliott (argued) and Stephanie Amaru, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California; Shelby L. Dyl and Michael A. Warley, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Fred Blum, Bassi Edlin Huie & Blum LLP, San Francisco, California; Christopher J. Dow, Edlin Gallagher Huie & Blum, San Francisco, California; Thomas J. Salerno, Stinson LLP, Phoenix, Arizona; Reynold L. Siemens, Covington & Burling LLP, Los Angeles, California; for Defendant-Appellant.

**OPINION**

TALLMAN, Circuit Judge:

Whittaker Corporation ("Whittaker") and the Santa Clarita Valley Water Agency ("SCVWA" or "Agency") cross-appeal a $68 million judgment in favor of the Agency entered by the Honorable Stanley Blumenfeld, Jr., following a combined 11-day jury and bench trial for state tort causes of action and a finding of liability under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*. We have jurisdiction under 28 U.S.C. § 1291.

Whittaker challenges the jury award on a number of grounds, but it does not appeal the finding of liability under CERCLA. It argues that: (1) the district court abused its discretion by permitting SCVWA to assert restoration costs as a measure of damages for the first time after the close of discovery, (2) SCVWA did not adequately establish that the groundwater treatment facilities are an appropriate measure of damages, and (3) the jury award of costs was not

reasonable. After carefully reviewing the record, we hold that none of Whittaker's arguments are availing, and thus we affirm the jury award against Whittaker.

SCVWA cross-appeals the district court's denial of (1) injunctive relief under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*., (2) a finding of liability for certain incurred response costs under CERCLA, (3) declaratory relief under CERCLA, (4) prejudgment interest on a category of response costs, and (5) attorneys' fees. We hold that the district court's denial of relief under RCRA, prejudgment interest, and attorneys' fees were proper, and thus we affirm. However, we hold that the district court erred in denying SCVWA a finding of liability against Whittaker for one category of incurred response costs under CERCLA, and by denying SCVWA declaratory relief under CERCLA. We reverse and remand so the district court may amend its judgment to address these two narrow issues.

## I.  FACTS

SCVWA is a public water agency in northern Los Angeles County that was formed in 2018 when the California legislature combined four entities that had previously supplied water to the over 300,000 residents of Santa Clarita Valley. SCVWA supplies water to its customers primarily through a combination of local groundwater pumped from wells and surface water purchased from the State Water Project (which moves water from Northern to Southern California by way of aqueducts). The Agency pumps groundwater from two aquifers—a shallow aquifer called the Alluvium, and a deeper, larger aquifer underlying the Alluvium called the Saugus Formation. SCVWA operates several supply wells: at issue

in this case are Saugus 1 ("S-1"), Saugus 2 ("S-2"), V-201, and V-205 (collectively, "wells"). The wells all pump water from the Saugus Formation. S-1 and S-2 were installed in 1988, V-201 in 1989, and V-205 in 2004.

In 1943, Whittaker's predecessor landowner, Bermite Powder Company ("Bermite"), began producing munitions and explosives on a 996-acre site located in Santa Clarita, California ("Site"). Bermite operated at the Site until 1967, when Whittaker acquired the property and continued producing munitions and explosives from 1967 until 1987. The manufacturing operations of both companies at the Site required the extensive use of a variety of toxic chemicals and solvents. The chemicals included perchlorate and the volatile organic compounds ("VOC") perchloroethylene ("PCE") and trichloroethylene ("TCE"). Perchlorate, PCE, and TCE are hazardous substances.

Both companies disposed of large volumes of perchlorate, PCE, and TCE into the ground through improper waste disposal practices such as dumping the chemicals onto the ground and burying them under the ground. Hazardous waste has been found in the soil and groundwater beneath the Site. Investigations of the contamination began in the 1990s and found that perchlorate and VOCs were released in the same areas across the Site and generally followed the same pathway as groundwater. These hazardous substances from the Site have migrated underground into the Saugus Formation and travelled offsite through groundwater pathways.

Perchlorate and VOCs have important differences that characterize their migratory pathways through groundwater. Perchlorate is an anion, which means that it dissolves in water. Plumes of perchlorate will migrate through

groundwater at roughly the same speed as the water itself. VOCs, on the other hand, are hydrophobic, meaning that they tend to stick to organic matter such as soil rather than dissolve in water. This results in plumes of VOCs migrating through groundwater at much slower speeds than perchlorate. Because of these characteristics, to date, perchlorate has migrated much further and faster through the Saugus Formation than VOCs.

By way of background, there are a number of treatment options that can make contaminated water potable. It can be treated with a filtration system to remove the contaminants. Contaminated water can be blended with clean water to dilute the contaminants to levels safe for human consumption or discharge into natural waterways. Or a combination of treatment and blending can be utilized to remove contamination. Additionally, containment wells can be used to pump contaminated water out of the aquifer for treatment and disposal, which serves to reduce the migration of the contaminants downgradient.

## A. Wells S-1 & S-2

Perchlorate was first discovered in groundwater extracted from S-1 and S-2 in 1997. The Agency's predecessor informed the California Division of Drinking Water ("DDW") of the contamination and took the wells out of service. DDW allowed the wells to reopen following installation of a perchlorate treatment facility known as the Saugus Perchlorate Treatment Facility ("SPTF"). Pursuant to a 2007 settlement agreement between Whittaker and SCVWA, Whittaker was required to cover the cost of the SPTF, as well as pay for replacement water to compensate SCVWA for the lost pumping capacity.

The SPTF treats the water at both S-1 and S-2 for perchlorate; however, during the installation of the treatment facility, VOCs were detected in the wells. Because of the presence of the hazardous contaminants, DDW classified the Saugus Formation as an "extremely impaired" groundwater source, which triggered heightened permitting obligations. One of these obligations requires SCVWA to deliver water from S-1 and S-2 with a non-detect level ("NDL") of VOCs; the NDL is one-tenth of the maximum contaminant level ("MCL") established for drinking water. For SCVWA to meet this obligation it must blend the water treated at the SPTF with contaminant-free water to the point that VOCs are not detected. SCVWA purchases water from the State Water Project to blend with the treated water until it meets the NDL criteria for VOCs. In 2010, following the completion of the treatment system, SCVWA regained its drinking water permit from DDW and resumed using wells S-1 and S-2 to supply potable water to its customers.

## B.  Well V-201

In 2010, perchlorate was found in groundwater extracted from V-201 and the well was taken out of service. In 2015, Whittaker and SCVWA entered into an agreement, separate from the 2007 S-1/S-2 settlement agreement, to address the V-201 contamination issue. The new agreement required Whittaker to create a wellhead treatment facility that would "(1) contain further transport of perchlorate to downgradient wells; (2) restore potable water supply from V-201 with a Treatment System design capacity of up to 2400 [gallons per minute] . . . and (3) meet all applicable California regulatory standards."

In 2017—seven years after the contaminants were first detected in V-201—the perchlorate wellhead treatment

facility came online. However, DDW has yet to reissue a drinking water permit for this well. Instead, the well is operating as a containment well; it pumps contaminated water from the aquifer, treats it, then discharges it into the Santa Clara River pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit issued by the California Water Resources Control Board. SCVWA must purchase water from the State Water Project to blend with the treated water in order to be in compliance with the NPDES permit.

SCVWA has not been able to deliver water to its customers from V-201 since perchlorate was first detected in 2010 despite the perchlorate treatment system being operational since 2017. Because V-201 has been out of service, SCVWA has had to continually purchase replacement water from the State Water Project to adequately supply its customers. From 2012 to 2017, Whittaker covered the cost of replacement water, but from 2017 to present, SCVWA has been covering the cost.

### C. Well V-205

In 2012, perchlorate was discovered in V-205; although the perchlorate levels were below the MCL, it was immediately taken offline. V-205 has no treatment facilities on it and has not returned to service since it was taken offline. SCVWA purchases replacement water from the State Water Project to make up for the lost well capacity from V-205. In 2018, perchlorate was detected at V-205 at levels that exceed the MCL. It was this finding that triggered SCVWA's filing of the current lawsuit against Whittaker in August 2018.

## II.  PRIOR PROCEEDINGS

SCVWA's lawsuit against Whittaker alleged multiple state and federal law violations, and sought injunctive relief in addition to compensatory and punitive damages. Following the initiation of the lawsuit, Whittaker filed a third-party complaint against Keysor-Century Corporation ("Keysor") and Saugus Industrial Center LLC ("SIC"). Whittaker asserted that Keysor was the former owner of a property west of the Site where it operated a resin compound manufacturing facility and allegedly utilized over 50 million pounds of VOCs in its annual operations.  Whittaker further alleged that SIC, as the purchaser of the Keysor property, knew or should have known of the contamination issues.

SIC and SCVWA subsequently entered into a settlement agreement.  SIC agreed to pay SCVWA $2.9 million to settle all VOC issues between the parties, contingent upon the court granting a Motion for Good Faith Settlement.  The settlement was also conditioned on the court dismissing Whittaker's claims against SIC and dismissing SIC from the action—both with prejudice.  SCVWA and SIC agreed to release one another from liability in the action after payment was received.  In approving the settlement, the district court determined that the settlement would offset any judgment against Whittaker on a *pro tanto* basis.

### A.  Jury Trial

The common law claims for negligence, trespass, public nuisance, and private nuisance were tried before the jury in an 11-day trial.  The jury found Whittaker liable under all of the common law theories and awarded damages for past harm of $7 million, and restoration or repair costs of $68.3

million.[1]  It also found that SCVWA, SIC, and Whittaker were all negligent, apportioning 10% of fault to SCVWA for failure to mitigate damages, 30% of fault to SIC, and 60% of fault to Whittaker.  The jury verdict was reduced to $64,870,000, which reflects a 10% reduction due to SCVWA's fault, and a reduction of $2.9 million reflecting the *pro tanto* offset from the SIC settlement.

After the jury returned its verdict in SCVWA's favor, the Agency moved for attorneys' fees under California's private attorney general statute, Cal. Civ. Proc. Code § 1021.5.  The district court denied the motion, holding that the plain language of the statute bars the award of fees to a public agency on these facts.

## B.  District Court Findings of Fact and Conclusions of Law

Following the jury trial, the district court issued its Findings of Fact and Conclusions of Law ("FF/CL") as to the statutory claims tried to the bench.

The district court denied SCVWA relief under RCRA because the risk of harm from the migration of VOCs was not "imminent and substantial."  The court held that substantial remediation, containment, monitoring, and extensive government oversight of the cleanup mitigated any imminent risk posed by the VOCs.

---

[1] Following post-trial motions, the district court vacated the jury's finding of liability as to SCVWA's trespass claim because SCVWA did not establish that it owned an interest in the land.  However, it held that, irrespective of the merits of Whittaker's arguments, "the damages award is independently supported by each claim," and therefore "it would not seem to affect the amount of the ultimate judgment."

Next, the district court held that SCVWA incurred $675,000 in costs for investigation, permitting, and design ("IPD") under CERCLA; it apportioned 10% to SCVWA and the balance to Whittaker, consistent with the jury's finding that 10% of SCVWA's damages resulted from its own failure to mitigate. However, it found that SCVWA could not establish CERCLA liability against Whittaker for its blend water costs and replacement water costs primarily because it would be duplicative of the jury award, and thus precluded by CERCLA's bar on double recovery, 42 U.S.C. § 9614(b). The court further supported its finding that the Agency is not entitled to a finding of liability against Whittaker for its replacement water costs because it did not establish that it substantially complied with the National Contingency Plan ("NCP") under federal law. It made no explicit finding as to the Agency's compliance with the NCP for its blend water costs. The district court also held that SCVWA was not entitled to declaratory relief under CERCLA, 42 U.S.C. § 9613(g)(2), for its blend and replacement water costs because it failed to establish CERCLA liability for those costs. It denied declaratory relief for IPD costs because it concluded that it would be duplicative of the jury award—and thus barred by 42 U.S.C. § 9614(b).

Finally, the district court denied SCVWA prejudgment interest on its replacement water costs because it could not establish that it had been harmed by the deprivation, as it passed the additional costs on to its customers. However, the district court granted SCVWA prejudgment interest of $363,318.09 for V-201 blend water costs that were incurred to be in compliance with the NPDES permit, because those costs could not be recouped.

The final judgment awarded SCVWA: (1) $64,870,000 from the jury award ($75,300,000 less 10% due to SCVWA's apportioned fault, and less $2,900,000 for the *pro tanto* offset from the SIC settlement); (2) $607,500 from the FF/CL for the IPD costs under CERCLA; (3) $363,318.09 in prejudgment interest for the negligence and nuisance claims; (4) $2,575,249.74 in prejudgment interest for the post-verdict period (Dec. 3, 2021, to June 27, 2022); and (5) $119,375.65 in taxed costs, for a total judgment entered of $68,535,443.48.

## III.   DISCUSSION

Whittaker raises three issues on appeal and SCVWA raises five.  We address each in turn.

### A.  Rule 26 Disclosures

Whittaker challenges the district court's decision to allow SCVWA to assert restoration costs as part of its theory of damages after the close of discovery.  It argues that the district court abused its discretion by denying Whittaker's Motion in Limine regarding exclusion of evidence supporting the restoration costs (i.e. costs to treat the contaminated water) as a violation of Federal Rule of Civil Procedure 26.  Evidentiary rulings are reviewed for abuse of discretion.  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("[W]e must affirm the district court unless its evidentiary ruling was manifestly erroneous *and* prejudicial.") (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).  "This court reviews *de novo* a district court's interpretation of the Federal Rules of Civil Procedure." *Cal. Scents v. Surco Prods., Inc.*, 406 F.3d 1102, 1105 (9th Cir. 2005) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc.*, 146 F.3d 1071, 1073 (9th Cir. 1998)).

Federal Rule of Civil Procedure 26 requires a party to disclose "a computation of each category of damages claimed by the disclosing party . . . ." Fed. R. Civ. P. 26(a)(1)(A)(iii). If a party fails to disclose information required by Rule 26 then exclusion of the evidence under Federal Rule of Civil Procedure 37 is proper "unless the failure to disclose was substantially justified or harmless." *Hoffman v. Constr. Protective Servs. Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). Exclusion of evidence under Rule 37 for failure to disclose pursuant to Rule 26 is a tool that courts can use to sanction parties for failing to make discoverable evidence available or for failing to cooperate during discovery. Fed. R. Civ. P. 37(b)(2)(A)(ii), (c)(1); Fed. R. Civ. P. 26(a); *Estakhrian v. Obenstine*, 233 F. Supp. 3d 824, 837 n.11 (C.D. Cal. 2017).

Whittaker does not contend that SCVWA failed to disclose the computation of damages required by Rule 26, instead it asserts that SCVWA committed error by not disclosing the legal theory that entitled it to those damages. The district court determined that Whittaker's argument fails because legal theories are not subject to Rule 26 disclosures, and SCVWA timely disclosed all of the supporting evidence for the damages that it sought. *See Athena Cosms., Inc. v. AMN Distrib. Inc.*, No. 2:20-cv-05526-SVW-SHK, 2022 WL 4596549, at *6 (C.D. Cal. Aug. 16, 2022) (holding that Rule 26 requires the disclosure of evidence but not the disclosure of a legal theory).

Whether Rule 26 requires the disclosure of legal theories is an issue of first impression for us. District courts within our circuit have consistently held that it does not.

In *Athena Cosmetics*, which concerned counterfeit trademark infringement, the defendant argued that the plaintiff violated Rule 26 because it did not timely disclose a key legal theory or identify the evidence to support it. 2022 WL 4596549, at *6. The Central District of California held "Rule 26 requires the identification of certain evidence and its disclosure to the opposing party, it does not require a party to disclose its legal theory to the opposition . . . ." *Id.* It further noted that, contrary to the defendant's contention, the evidence *had* been disclosed as "key evidence from the very inception of this case." *Id.*

In *PCT International Inc. v. Holland Electronics LLC*, the defendant in a patent infringement case argued that the plaintiff could not pursue an "indirect infringement theory" because it failed to fully disclose that theory during discovery. No. CV-12-01797-PHX-JAT, 2015 WL 875200, at *5 (D. Ariz. March 2, 2015). The District of Arizona held that Rule 37(c)(1) "concerns the exclusion of only untimely disclosed *evidence*," and does not bar the introduction of a previously undisclosed legal theory. *Id.*

In *Estakhrian*, when the defendant attempted to bar the plaintiff from asserting two new legal theories after the close of discovery, the Central District of California denied its request because Rule 37 is a discovery rule; "it is not a sanction for the failure to timely disclose a legal theory." 233 F. Supp. 3d at 837 n.11 (citations omitted).

We agree and now hold that Rule 26 does not require disclosure of legal theories. Rule 26 is a discovery rule intended to ensure that the parties have access to the information that will be used to support a claim or defense. In the operative complaint, SCVWA explicitly requested "payment of all necessary costs of response, removal and

remedial action costs, [and] costs of abatement and liability incurred by [SCVWA] as a result of any release or threatened release of hazardous substances at the Whittaker Site . . . ."  Whittaker had access to the computation of damages sought by SCVWA, as required by Rule 26(a)(1)(A)(iii).  Whittaker equally had access to the applicable law and facts and could have mounted a defense based upon the damages sought and the evidence that supported the computation of damages.  As the district court aptly stated: Whittaker "has not shown that [SCVWA] is responsible for failing to alert the defense to a possible defense theory arising under California law."  We agree, and find the district court did not abuse its discretion by permitting SCVWA to assert a legal theory at trial that it did not include in its Rule 26 disclosures.

## B.  Groundwater Treatment Facilities

Whittaker next challenges the jury's award of restoration costs on the basis that SCVWA did not properly establish the original condition of the property, which Whittaker argues makes the groundwater treatment facilities an inappropriate measure of damages.  Whittaker contends that without establishing the original condition of the property, the award of damages to build VOC treatment facilities would put SCVWA in a better position than it had been prior to injury.  The district court denied Whittaker's motion for Renewed Judgment as a Matter of Law on the issue of whether groundwater treatment facilities are a proper measure of damages, finding that the jury awarded damages to "repair the harm caused by the groundwater contamination by removing the contaminants prior to delivering drinking water to the public—and to that extent, . . . 'compensate the injured party for the loss sustained.'"

"Whether a plaintiff is entitled to a particular measure of damages is a question of law subject to de novo review." *Rony v. Costa*, 148 Cal. Rptr. 3d 642, 646 (Ct. App. 2012) (internal quotations and citations omitted); *see R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 272 (9th Cir. 1991). We hold that the district court correctly applied California tort law in determining that groundwater treatment facilities are an appropriate measure of damages, and thus affirm.

Under California's general tort damages law, the proper measure of damages "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." Cal. Civ. Code § 3333; *Heninger v. Dunn*, 162 Cal. Rptr. 104, 106 (Ct. App. 1980). California courts recognize that "there is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property, and whatever formula is most appropriate in the particular case will be adopted . . . ." *Mozzetti v. City of Brisbane*, 136 Cal. Rptr. 751, 757 (Ct. App. 1977) (cleaned up); *Heninger*, 162 Cal. Rptr. at 106–07; *Armitage v. Decker*, 267 Cal. Rptr. 399, 409 (Ct. App. 1990).

California law holds that plaintiffs in tort actions should not get damages in an amount that would place them "in a better position than [they] would have been had the wrong not been done." *Safeco Ins. Co. of Am. v. J & D Painting*, 21 Cal. Rptr. 2d 903, 905 (Ct. App. 1993) (citations omitted); *see also Mozzetti*, 136 Cal. Rptr. at 757 ("The primary object of an award of damages in a civil action, and the fundamental principle on which it is based, are just compensation or indemnity for the loss or injury sustained by the complainant, and no more.") (emphases and citations omitted).

Whittaker maintains that SCVWA cannot recover restoration costs for VOC treatment facilities without proving the original condition of the property, otherwise it will be put in a better position than it had been pre-harm. Curiously though, it conceded during its closing argument to the jury that costs to install treatment facilities to remove perchlorate are an appropriate measure of damages because it admitted that the perchlorate contamination came from the Site. It follows, that if the fact finder similarly determines that the VOC contamination came from the Site, then damages in an amount to install VOC treatment facilities would be an appropriate measure of damages. The district court noted as much: "In closing argument, [Whittaker] seemed to agree that water treatment was a proper measure of damages and invited the jury to return a verdict against it—just not in the scope and amount of damages sought by [SCVWA]."

Furthermore, once SCVWA produced evidence regarding restoration costs, the burden shifted to Whittaker to demonstrate that the costs were inappropriate. *See Armitage*, 267 Cal. Rptr. at 410. In *Armitage*, the California Court of Appeal held that:

> Where a plaintiff establishes damages by showing depreciation in the value of real property, courts have held defendants to the burden of coming forward with proof that cost of restoration would be less. It follows that when a plaintiff proves damages by showing the cost of repairs it should be incumbent on the defendant to introduce

> evidence that the repair costs exceed the
> value of the property.

*Id.* (internal citations omitted). Whittaker did not meet this evidentiary burden.

SCVWA produced evidence showing the cost to restore the property to its condition absent the VOC contamination. Therefore, under the reasoning of *Armitage*, Whittaker could have rebutted the evidence of restoration costs by producing evidence that awarding SCVWA damages in that amount would put it in a better position than it had been prior to the injury—it failed to do so.

The jury determined that SCVWA adequately proved that Whittaker negligently contaminated the groundwater, and that its negligence was a substantial factor in causing SCVWA harm. The jury then awarded SCVWA damages in an amount to "reasonably compensate [SCVWA] for the harm" caused by both VOC and perchlorate contamination. Whittaker did not carry its burden of proving that restoration damages to build the treatment facilities would place SCVWA in a better position than it had been prior to injury. Therefore, we hold that restoration costs in the form of VOC treatment facilities are a proper measure of damages to "compensate [SCVWA] for all the detriment proximately caused" by Whittaker's contamination. Cal. Civ. Code § 3333. Accordingly, we affirm.

## C. Reasonableness of the Jury Verdict

Finally, Whittaker argues that if the restoration costs are not vacated, they should be reduced because they are unreasonable in light of the limited harm that the VOC contamination has had on drinking water. The district court disagreed, holding that there was sufficient evidence for a

reasonable fact finder to support the award based on (1) testimony about DDW withholding the drinking water permit for V-201 due to contamination, and (2) the fact that water pumped from the Saugus Formation must meet especially stringent permitting standards due to the source being extremely impaired. We agree, and affirm the amounts awarded.

A jury verdict will be upheld under the substantial evidence standard if there is "such reasonable evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *In re Exxon Valdez*, 270 F.3d 1215, 1237 (9th Cir. 2001) (quoting *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999) (en banc)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . [and] all justifiable inferences are to be drawn in [the prevailing party's] favor." *Id.* (alterations in original) (quoting *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990)).

Whittaker maintains that the jury award cannot stand because only a small portion of the award, about $19 million, is required to install a perchlorate treatment facility at V-205. It argues that the roughly $40 million award to install VOC treatment facilities on all four wells is unreasonable given the fact that VOC levels at the four wells have not exceeded the MCL and SCVWA continues to serve water even with "trace amounts" of VOCs in it.

There is sufficient evidence to uphold the jury verdict based on testimony that DDW is withholding the issuance of a drinking water permit for V-201 due to VOC contamination. SCVWA's Chief Operating Officer,

Abercrombie, testified that DDW has still not issued a drinking water permit for V-201 despite the perchlorate treatment facility becoming operational in 2017. He stated on cross-examination that "we have had discussions with the Division of Drinking Water, and I know we asked, if we were to put in treatment, would we get a permit? And the answer was, you'd get it pretty quick." SCVWA's Director of Operations and Maintenance, Alvord, also testified that SCVWA believes DDW will expedite the permitting process if VOC treatment is implemented, stating: "We have a problem with getting a permit for V-201 because we have VOCs in V-201." The jury could have discounted the credibility of SCVWA's testimonial evidence; however, it was not required to do so. *In re Exxon Valdez*, 270 F.3d at 1237. Based on the proffered testimony, if deemed credible, the jury was justified in finding that SCVWA's drinking water permit for V-201 was being held up due to VOC contamination.

Further, there is substantial evidence that DDW requires water pumped from the Saugus Formation to meet the NDL for VOCs, rather than the MCL, because the Saugus Formation is a "highly impaired water source." To achieve the NDL for VOCs in S-1 and S-2, SCVWA must purchase VOC-free water from the State Water Project to blend with the water treated at the SPTF before serving it to customers. SCVWA also purchases water from the State Water Project to blend with the treated water from V-201 in order to meet the NPDES permit requirements to discharge the water into the Santa Clara River.

Although Whittaker relies on SCVWA's water consistently remaining below the MCL to argue that there is no harm, it overlooks SCVWA's evidence that the water does not always meet DDW's operational goals due to VOC

contamination. And even though DDW will not necessarily pull a drinking water permit for sporadic violations of its operational goals, it is incumbent on a permit holder to meet permit requirements. As the district court correctly noted, Whittaker has produced no authority requiring a regulatory order or illness to occur prior to obtaining restoration damages. The jury credited SCVWA's testimonial evidence that the standard as to VOC limits for water extracted from the Saugus Formation is the NDL, not the MCL, and awarded damages to address the contamination accordingly.

The jury is entitled to weigh the evidence presented, make credibility determinations, and draw legitimate inferences from the facts. *In re Exxon Valdez*, 270 F.3d at 1237; *see Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) ("We may not assess the credibility of witnesses in determining whether substantial evidence exists to support the jury's verdict.") (citation omitted). "A trial determination has a great deal of force, whichever way it goes." *In re Exxon Valdez*, 270 F.3d at 1237. Here, there is substantial evidence to support the jury verdict because reasonable minds could conclude from the evidence presented that VOC treatment facilities would expedite drinking water permits and because DDW requires VOC levels to meet the NDL rather than the MCL. Accordingly, we affirm the jury verdict.

## D. Resource Conservation and Recovery Act

SCVWA seeks "injunctive relief under RCRA to require Whittaker to install groundwater monitoring wells off-site, to investigate the extent of perchlorate and VOC plumes migrating from Whittaker's site, and to delineate the extent of the plumes." The district court denied injunctive relief because it held that significant remediation efforts

supervised by regulatory agencies mitigated any imminent and substantial endangerment. "In reviewing a judgment following a bench trial, this court reviews the district court's findings of fact for clear error and its legal conclusions de novo." *Price v. U.S. Navy*, 39 F.3d 1011, 1021 (9th Cir. 1994) (citation omitted). Because the district court correctly applied the legal standard set forth by RCRA and Ninth Circuit case law in reaching its finding that any continued harm from Whittaker's contamination is not substantial and imminent, we affirm the RCRA determination.

Under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), injunctive relief is available if a plaintiff shows that the defendant is:

> [(1)] any person . . . including any past or present generator . . . or past or present owner or operator of a treatment, storage, or disposal facility, [(2)] who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste, [(3)] which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B); *see Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1023 (9th Cir. 2014). Only the third element—imminent and substantial endangerment—is at issue here.

"An endangerment can only be 'imminent' if it 'threaten[s] to occur immediately,' and the reference to waste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger."

*Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485–86 (1996) (alteration in original) (internal citation omitted). For the endangerment to be substantial, "there must be some necessity for the action." *U.S. Navy*, 39 F.3d at 1019. The imminent and substantial endangerment element should be construed broadly to allow for affirmative equitable relief. *See Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007); *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1228 (E.D. Wash. 2015). "A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present . . . ." *U.S. Navy*, 39 F.3d at 1019 (citing *Env't Def. Fund, Inc. v. Env't Prot. Agency*, 465 F.2d 528, 535 (D.C. Cir. 1972)). "Imminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose.'" *Id.* (quoting *United States v. Price*, 688 F.2d 204, 213 (3d Cir. 1982)). The threat of harm must be "present *now*, although the impact of the threat may not be felt until later." *Id.*

We held in *U.S. Navy* that extensive government involvement with the cleanup operations of contaminated soil at a former United States Navy junkyard—repurposed into a residential neighborhood—mitigated any risk of imminent endangerment. *Id.* at 1012, 1018–20. There, we found the plaintiff's contention that she would need to replace her home's foundation at some point in the future insufficient to establish imminency because it was speculative whether there were hazardous contaminants beneath the foundation, and when, if ever, the foundation would need to be replaced. *Id.* at 1019–20.

Similarly, here, there has been extensive government oversight in the cleanup of the Site, alleviating the threat of

imminent and substantial endangerment. In 2002 the California Department of Toxic Substance Control ("DTSC") entered a remedial action order against Whittaker, finding that its contamination at the Site created an imminent and substantial endangerment to the public health or welfare or the environment. The order requires Whittaker to seek review and approval from DTSC for all remedial actions at the Site. Pursuant to that order, Whittaker has engaged in removal of VOCs from the subsurface soil and has installed over two hundred monitoring wells on the property and offsite to investigate groundwater contamination. In May 2021, DTSC approved the completion of remediation at Operable Unit 7 ("OU7"), which encompassed the groundwater contamination from the Site, indicating that prior harms had been satisfactorily remediated. *See Meghrig*, 516 U.S. at 485–86.

The district court held that any threat posed by Whittaker's contamination is not imminent and substantial because DTSC has been extensively involved in cleanup at the Site, Whittaker has engaged in remedial actions, and it has installed over two hundred monitoring wells. In short, there is no "necessity for . . . action" in excess of the actions already taken and those that are currently ongoing. *U.S. Navy*, 39 F.3d at 1019. We agree, and, accordingly, we affirm the district court's ruling on this issue.

### E. CERCLA Liability

SCVWA seeks a finding of liability against Whittaker under CERCLA for its incurred response costs. The district court held that Whittaker was not liable for SCVWA's blend water costs and replacement water costs, but it held Whittaker liable for SCVWA's third category of response costs: investigation, permitting, and design ("IPD").

SCVWA challenges the district court's denial of a finding of liability for its incurred blend and replacement water costs. The district court's interpretation of CERCLA is reviewed de novo. *California v. Montrose Chem. Corp. of Cal.*, 104 F.3d 1507, 1512 (9th Cir. 1997) (citing *Idaho v. Howmet Turbine Component Co.*, 814 F.2d 1376, 1378 (9th Cir. 1987)).

We begin with a brief recitation of CERLCA liability. In enacting CERCLA, "Congress created a private claim for certain 'response costs' against 'various types of persons who contributed to the dumping of hazardous waste at a site.'" *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1375 (9th Cir. 1990) (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989)); 42 U.S.C. § 9607(a). For a private party to recover response costs pursuant to CERCLA it must:

> establish that (1) the site on which the hazardous substances are contained is a "facility" under . . . 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a).

*Id.* at 1358 (footnote omitted) (citing *Ascon Props., Inc*, 866 F.2d at 1152).

The parties agree that SCVWA has satisfied at least three of these elements. The Site is a facility under 42 U.S.C. § 9601(9); perchlorate, PCE, and TCE are hazardous substances that were released at the Site; and Whittaker is subject to the liability provisions because it "owned or operated" the Site when hazardous chemicals were released. 42 U.S.C. § 9607(a)(2). However, the district court denied granting SCVWA a finding of liability for its incurred blend and replacement water costs under § 9607(a) primarily because it held that such a finding is prohibited by CERCLA's bar on double recovery, 42 U.S.C. § 9614(b). The district court further held that SCVWA is not entitled to a finding of liability for its replacement water costs because it did not satisfy part of the third element of CERCLA liability: substantial compliance with the NCP, as required by § 9607(a)(4)(B). However, it made no such finding for SCVWA's incurred blend water costs, relying solely on the double recovery bar to hold that the Agency is not entitled to a finding of liability for those costs.

We will address each reason for the district court's denial of liability separately.

### 1. CERCLA's Bar on Double Recovery, 42 U.S.C. § 9614(b)

CERCLA's provision barring double recovery declares that "[a]ny person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same . . . costs" under CERCLA. 42 U.S.C. § 9614(b). The district court held that § 9614(b) precluded it from entering a finding of liability as to the blend and replacement water costs because at trial SCVWA sought "'just over $2.9 million' in blend water costs . . . and 'just

over $4.1 million' in replacement water costs," and the jury returned a verdict for $7 million for past damages, thus compensating it for the removal costs under state law. Therefore, according to the district court, a finding of liability would be double recovery of those costs.

Although the district court was correct in holding that § 9614(b) precludes a party from *receiving compensation* for the same costs, it misconstrued SCVWA's request for a finding of liability. SCVWA does not seek an award of damages under CERCLA, but rather it seeks a finding that Whittaker is *liable* for those damages. A finding of liability under CERCLA for past response costs ensures that a party can recover those costs if the damage award otherwise remains unsatisfied, and it provides the party access to other remedies under CERCLA that it may be entitled to in the future. *See e.g.*, 42 U.S.C. § 9613(g)(2) (mandatory declaratory judgment on liability that is binding on any subsequent action to recover further response costs).

We have not had an opportunity to clarify whether a finding of liability for incurred response costs under CERCLA is precluded by § 9614(b)'s bar on double recovery. We do so now and hold that § 9614(b) does not bar a finding of liability as long as the district court fashions the relief such that the plaintiff will not recover double compensation.

Indeed, the Southern District of California did just that in *Price v. U.S. Navy*, 818 F. Supp. 1326, 1332–33 (S.D. Cal. 1992), *aff'd*, 39 F.3d 1011 (9th Cir. 1994). There, the district court found that the plaintiffs had "met their burden of proof under CERCLA," and accordingly apportioned liability across the three responsible defendants. *Id.* at 1333. However, the court held that § 9614(b) barred plaintiffs from

receiving further damages because they had "incurred costs in the total amount of $34,628.56," and received "payments from [the State of California and a settlement] in the amount of $55,000.00, [therefore] the net award to plaintiffs is zero." *Id.* at 1332–33. We agree with the *Price* court's reasoning and hold that a finding of liability is not barred by § 9614(b) so long as the district court frames the relief such that the recovering party does not receive compensation for costs or damages that they have already received pursuant to state or federal law.

Because we now hold CERCLA's bar on double recovery does not preclude a finding of liability for incurred response costs, we must determine whether SCVWA has otherwise satisfied the elements of CERCLA for its incurred blend and replacement water costs such that a finding of liability is appropriate.

### 2. Liability for Blend Water Costs

We first turn to SCVWA's claim that it is entitled to a finding of liability against Whittaker for its blend water costs under CERCLA's citizen suit provision. Only the third element is at issue—whether a "'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan,' 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B)." *3550 Stevens Creek Assocs.*, 915 F.2d at 1358.

"Response costs are considered consistent with the NCP 'if the action, when evaluated as a whole, is in substantial compliance' with it." *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (quoting 40 C.F.R. § 300.700(c)(3)(i)). "[T]he issue of substantial compliance is a mixed question of law and fact. Its resolution involves the application of the law to a set of facts.

Our review is de novo." *Louisiana-Pac. Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994) (citing *Boone v. United States*, 944 F.2d 1489, 1492 (9th Cir. 1991)).

The NCP "is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *City of Colton*, 614 F.3d at 1003 (quoting *Carson Harbor Vill., Ltd. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) ("*Carson Harbor II*")). The U.S. Environmental Protection Agency ("EPA") requires a private party seeking recovery of response costs under CERCLA to substantially comply with the requirements of the NCP, which includes a number of regulations. 40 C.F.R. § 300.700(c)(3)(i), (5), (6). At issue for SCVWA is whether it properly complied with the public participation requirements of the NCP when it incurred the blend water costs.

There are two separate response actions that a private party may engage in that will entitle it to relief under CERCLA, 42 U.S.C. § 9607(a): (1) remediation actions and (2) removal actions. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1155 (C.D. Cal. 2003) ("*Unocal Corp.*") (citations omitted); 40 C.F.R. §§ 300.5, 300.430, 300.415. Remediation refers to actions that permanently remedy the harm caused by the release or threatened release of hazardous contaminants. § 300.5; *Unocal Corp.*, 287 F. Supp. 2d at 1155. Removal actions are short-term and meant to mitigate any immediate risk or harm caused by hazardous contamination. § 300.5; *Unocal Corp.*, 287 F. Supp. 2d at 1155. Remediation actions involve more stringent public participation requirements than removal actions. *Compare* § 300.430(c) (public participation requirements for remedial actions), *with* § 300.415(n) (public participation requirements for removal actions).

However, the NCP holds that "[p]rivate parties undertaking [either] response action[] should provide an opportunity for public comment concerning the selection of the response action." 40 C.F.R. § 300.700(c)(6).

SCVWA's blend water costs constitute removal actions because they are short-term, necessary costs, incurred in response to an immediate threat of a release of hazardous substances. *See Unocal Corp.*, 287 F. Supp. 2d at 1155; 40 C.F.R. § 300.5. SCVWA purchases contaminant-free water to blend with water treated at the V-201 wellhead treatment facility prior to discharging the water into the Santa Clara River in accordance with its NPDES permit. That the Agency later sought compensation from Whittaker to pursue a remediation action in the form of permanent treatment facilities supports the proposition that its blend water costs are removal actions.

The EPA has further delineated removal actions into two categories depending on the amount of time before on-site removal action must begin, each requiring differing levels of public participation. 40 C.F.R. § 300.415(n). Time-critical removal actions ("TCRA") have a planning period of less than six months before onsite action must begin. § 300.415(n)(2). These regulations require the least amount of public participation—a private party taking action must give adequate notice to the community within 60 days of the removal activity beginning, provide a public comment period, and prepare written responses to significant public comments. § 300.415(n)(2)(i), (ii), (iii). Within the TCRA framework, if the ultimate response action is expected to extend beyond 120 days, then the responding party must satisfy more thorough public participation requirements. § 300.415(n)(3). By the end of the 120-day period the responding party shall interview local interested parties,

prepare a "community relations plan" incorporating community concerns, and establish a local information repository.  § 300.415(n)(3)(i), (ii), (iii).

Non-time-critical removal actions ("non-TCRA") have a planning period of at least six months before onsite removal actions must begin.   40 C.F.R. § 300.415(n)(4).   These actions mandate the most stringent public participation requirements.  In addition to adhering to the requirements of § 300.415(n)(3), the responding party must complete an engineering evaluation/cost analysis ("EE/CA") to analyze removal alternatives.   § 300.415(b)(4)(i).   The public participation regulations require compliance with § 300.415(n)(3) before the EE/CA is completed.  *Id.*  The community must be notified of the availability of the EE/CA and given an opportunity to comment.  § 300.415(n)(4)(iii).  And again, the agency must respond to significant comments.  § 300.415(n)(4)(iv).

Even in the absence of substantial compliance with the NCP, some courts have indicated that extensive government oversight of the response actions may satisfy the public participation requirement.  *See Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2d Cir. 1998) (holding that extensive government oversight of response actions "serves the identical purpose that the public notice provision seeks to effectuate"), *abrogated in part by W.R. Grace & Co.-Conn. v. Zotos Int'l Inc.*, 559 F.3d 85, 89–90 (2d Cir. 2009); *Unocal Corp.*, 287 F. Supp. 2d at 1167 (agreeing with the holding of *Bedford Affiliates*, 156 F.3d at 428); *Waste Mgmt. of Alameda Cnty. v. E. Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1102–03 (N.D. Cal. 2001) (stating that "even assuming that government involvement could fulfill the public participation requirements in some circumstances, it would not be appropriate to do so here . . . [because it] was

not unusually extensive; nor did it lead to comparable opportunities for public input").

The Second Circuit held that the agency involvement in *Bedford Affiliates* was sufficient to satisfy the public participation requirement because the agency was involved in negotiating consent orders, investigating and implementing the site assessment and interim remedial measures, and overseeing the progress of the cleanup. 156 F.3d at 428.

In *Unocal Corp.*, the district court opined "that extensive government involvement in a private cleanup effort can, under appropriate circumstances, fulfill the public participation requirement of the NCP." 287 F. Supp. 2d at 1167. However, it noted that the substitution is only appropriate if there is evidence of "'extensive' or 'comprehensive' agency involvement in the cleanup, some evidence that the agency was applying standards that were identical to or consistent with the NCP, and some evidence that the agency's procedures allowed for public comment or involvement." *Id.* Finally, the court noted that the agency itself must seek public input in order to "fulfill the purpose of the NCP's community relations requirement." *Id.* at 1168.

In affirming the district court's *Unocal Corp.* decision, we noted that this "circuit has not decided if significant agency involvement can satisfy the National Contingency Plan's public participation requirement . . . ." *Carson Harbor II*, 433 F.3d at 1266. There, we declined to decide the issue of first impression because "[e]ven if significant agency involvement were enough to satisfy the National Contingency Plan's public participation requirement," the agency involvement "in this case is insufficient to do so." *Id.* The agency had visited the contaminated property and

participated in meetings regarding the pollution, but it did not take a lead role. *Id.* Additionally, the agency was not present during the preliminary investigation of the contaminated property and was not actively involved in the response action. *Id.*

We now hold that in limited circumstances substantial and extensive government agency involvement can satisfy the public participation requirements of the NCP. The record here supports that conclusion. The district court seemingly implied as much in its ruling on the parties' Motions for Summary Judgment/Adjudication stating: "Some of the public participation analysis is straightforward. The blended water costs are the result of government oversight, namely the contamination limits imposed by the California Regional Water Quality Control Board ("RWQCB") according to [SCVWA]'s National Pollution Discharge System Permit." We agree, although we base our decision on support in the record beyond SCVWA's NPDES permit conditions, and clarify that here, the permit conditions alone do not establish sufficient government oversight to satisfy the public participation requirements of the NCP.

First, this case is distinguishable from *Unocal Corp.* and *Waste Management* because the response actions in those cases were remediation actions—requiring a heightened level of public participation. 287 F. Supp. 2d at 1160–62; 135 F. Supp. 2d at 1101–03. Conversely, SCVWA's blend water costs constitute removal actions because they are short-term, necessary costs, incurred in response to an immediate threat of a release of hazardous substances. *See Unocal Corp.*, 287 F. Supp. 2d at 1155; 40 C.F.R. § 300.5.

Next, the perchlorate treatment facility at V-201 is part of the remedial action plan ("RAP") for OU7 (Operable Unit 7 encompasses groundwater contamination on and off-Site), which was required by DTSC pursuant to the 2002 remedial action order against Whittaker. The RAP itself must be in compliance with the NCP and DTSC's public participation policy. The RAP for OU7 analyzed six alternatives for addressing groundwater contamination in the Saugus Formation, finding that groundwater extraction and treatment was the most viable alternative. Pumping contaminated groundwater and treating it serves "as an additional line of defense to minimize the potential movement of perchlorate-impacted groundwater to the unimpacted groundwater areas and additional protection of other downgradient wells."

Finally, because DDW has not yet issued SCVWA a drinking water permit for V-201, the Agency must discharge the treated water into the Santa Clara River in accordance with the NPDES permit. In March 2018, RWQCB notified SCVWA that it violated the NPDES permit by discharging water into the Santa Clara River that exceeded certain constituent limits set by the permit. To settle this enforcement action, SCVWA began blending the water discharged from the V-201 wellhead treatment facility with contaminant-free water to be in compliance with the NPDES permit. RWQCB, as the enforcing agency, is required to publish any settlement of enforcement actions relating to NPDES permit violations to the public, allow thirty days for the public to comment, and respond to significant comments. SCVWA, RWQCB, and Whittaker decided to blend the water treated at the V-201 wellhead treatment facility so that V-201 can continue operating as a containment well to

protect groundwater resources from further perchlorate contamination, as required by DTSC.

We hold that, pursuant to the specific facts of this case, SCVWA has satisfied the public participation requirements of the NCP through substantial and extensive government agency involvement. The decision to implement wellhead treatment at V-201 and pump the contaminated water out of the aquifer to contain the migrating perchlorate plume resulted from significant oversight of remedial activities at the Site by DTSC. This decision was only made after multiple alternatives were analyzed. Because DDW has not issued a drinking water permit, SCVWA must discharge the treated water in accordance with the NPDES permit issued by RWQCB, the lead agency that oversees treated discharges. Due to a violation of that permit, SCVWA must blend the treated water prior to discharge—a decision that was published to the public and upon which the public was entitled to comment.

The removal action was subject to several government agency-imposed requirements, which were themselves subject to public comment—this substantial and extensive government oversight satisfies the public participation requirements of the NCP. This is a fact dependent query, and we decline to opine on whether government agency involvement will always satisfy the public participation requirements of the NCP, particularly in remediation actions that require more extensive public participation.

Because we now clarify that CERCLA's bar on double recovery does not preclude a district court from entering a finding of liability as to incurred response costs, and we hold that Whittaker is liable for SCVWA's incurred blend water costs, we remand to the district court to amend its judgment

consistent with this narrow holding. The jury apportioned 10% of fault to SCVWA; the district court adopted this finding when apportioning liability against Whittaker for IPD costs, holding Whittaker liable for the remainder. The same finding applies here on remand. Accordingly, Whittaker is liable under 42 U.S.C. § 9607(a) for 90% of SCVWA's blend water costs.

### 3. Liability for Replacement Water Costs

Finally, we must determine whether SCVWA substantially complied with the NCP for its replacement water costs. The district court held that it did not, finding that it dispensed with the public participation requirement entirely.

SCVWA advances two arguments as to why it is entitled to a finding of liability against Whittaker for its replacement water costs. First, it argues that the replacement water was a TCRA, and that it complied with the lower standard of public participation required for TCRAs. Next, it argues that even if it did not substantially comply with the public participation requirement, there was sufficient government agency oversight to satisfy the NCP. Neither argument is availing, and thus we affirm the district court's denial of a finding of liability as to SCVWA's replacement water costs.

SCVWA first argues that the replacement water costs constitute a TCRA, and the district court erred in finding that it did not substantially comply with the less stringent requirements. However, regardless of whether the replacement water costs constitute a TCRA, it is undisputed that the ultimate response action lasted longer than 120 days. As discussed above, if a TCRA extends beyond 120 days the more thorough requirements of 40 C.F.R. § 300.415(n)(3) are triggered. These regulations require the responding party

to interview local interested parties, prepare a community action plan, and establish a local information repository, in addition to providing a public comment period as required by § 300.415(n)(2).

SCVWA presented evidence that it sought public input and participation in remediation actions for V-201, S-1, and S-2, but it did not identify any community involvement in selecting the replacement water removal action. Instead, it relied on its regular communications with the public to argue that it did not need to engage in any further public participation in choosing the replacement water removal action because the public is aware that SCVWA serves water from both groundwater and surface water sources. SCVWA's expert, Dr. Zelikson, further opined that the TCRA regulations, including the 120-day rule, do not apply when the action is not visible to the public. SCVWA has not pointed to any authority that supports its assertion that the TCRA requirements only apply to visible removal actions.

Because the replacement water removal action extended longer than 120 days, SCVWA had to engage in some community outreach, regardless of whether the action was a TCRA or non-TCRA. 40 C.F.R. § 300.415(n)(3). SCVWA did not produce evidence demonstrating compliance with this less stringent requirement; indeed, it argued instead that it did not have to comply with the regulations at all because the removal action was not visible to the public. Accordingly, SCVWA did not satisfy the public participation requirements of the NCP.

Next, SCVWA argues that the involvement of DDW and DTSC was extensive enough to satisfy the public participation requirements of the NCP. SCVWA relies solely on agency involvement in the cleanup of the Site

generally to argue that the agencies were substantially involved in the decision to purchase replacement water—this is insufficient.  Unlike the blend water costs that were incurred to comply with the NPDES permit—a requirement to operate V-201 as a containment well as contemplated by the RAP—the replacement water costs do not share a nexus with DTSC's goal of removing the migrating perchlorate plume.  Further, RWQCB's regulations require it to publish and allow public comment on any settlement of enforcement actions, including the decision to blend the treated water prior to discharge.  There is no indication that either agency required a public comment period for the decision to purchase replacement water.

Because the agencies were not specifically involved in the removal action of purchasing replacement water, SCVWA cannot establish extensive government oversight sufficient to satisfy the public participation requirements of the NCP.  Accordingly, we affirm the district court's finding that SCVWA is not entitled to a finding of liability under CERCLA for its replacement water costs.

## F.  Declaratory Relief Under CERCLA

SCVWA seeks a declaratory judgment under 42 U.S.C. § 9613(g)(2).  The district court denied declaratory relief, finding that the jury award of future costs associated with the treatment facilities was sufficient and any further relief would be duplicative.  The district court's interpretation of CERCLA is reviewed de novo.  *Montrose Chem. Corp. of Cal.*, 104 F.3d at 1512.  Because § 9613(g)(2) is mandatory, we hold that the district court erred by denying declaratory relief as to the incurred response costs for which SCVWA has established CERCLA liability.

Section 9613(g)(2) provides that when a party succeeds in an action under 42 U.S.C. § 9607, "the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added); *City of Colton*, 614 F.3d at 1007 ("[I]f a plaintiff successfully establishes liability for the response costs sought in the initial cost-recovery action, it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions."). We have previously construed the language of § 9613(g)(2) as "mandatory relief." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 586 (9th Cir. 2018).

Future response costs, not yet incurred, are not recoverable under CERCLA. *ASARCO LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 866 (9th Cir. 2020); *In re Dant & Russell, Inc.*, 951 F.2d 246, 249–50 (9th Cir. 1991). "Instead, a declaratory judgment, whereby *liability* for future response costs would be allocated at a set percentage across responsible parties, is the proper mechanism for recouping future response costs in the CERCLA regime." *ASARCO LLC*, 975 F.3d at 866 (emphasis added).

The district court denied SCVWA declaratory relief because the jury awarded past and future damages pursuant to the state law tort claims, obviating the need for the Agency to recover further response costs. It is possible, or even likely, that SCVWA may never incur further costs that are not already fulfilled by the jury award. And to be sure, even with a grant of declaratory relief, CERCLA's bar on double recovery will prevent SCVWA from receiving costs that are duplicative of the jury award. 42 U.S.C. § 9614(b). However, "[r]egardless of whether future response costs are speculative—or even . . . affirmatively unlikely—CERCLA

requires that a successful plaintiff in a section 107(a) action be awarded . . . declaratory relief." *Pakootas*, 905 F.3d at 586.     Therefore, we hold that SCVWA is entitled to declaratory relief pursuant to § 9613(g)(2) for the two categories of response costs that Whittaker is liable for: blend water costs and IPD costs.  Accordingly, we remand to the district court to amend its judgment consistent with this opinion.

## G.  Prejudgment Interest

SCVWA next argues that the district court erred by only awarding prejudgment interest for one category of response costs—its incurred blend water costs.  The district court denied prejudgment interest for replacement water costs reasoning that SCVWA did not experience economic harm by incurring those costs because it passed the costs onto customers.  An award of prejudgment interest is reviewed for abuse of discretion.  *Bullis v. Sec. Pac. Nat'l Bank*, 21 Cal. 3d 801, 815 (1978).  We find that the district court did not abuse its discretion by limiting SCVWA's entitlement to prejudgment interest on only the costs that it was unable to recoup.  Accordingly, we affirm.

Under California law, interest may be awarded at the discretion of the fact finder, "[i]n an action for the breach of an obligation not arising from contract . . . ."  Cal. Civ. Code § 3288; *Greater Westchester Homeowners Ass'n v. City of Los Angeles*, 26 Cal. 3d 86, 102–03 (1979).  Prejudgment interest is a form of compensatory damages meant to make the injured party whole.  *Bullis*, 21 Cal. 3d at 815; *Nordahl v. Dep't of Real Estate*, 121 Cal. Rptr. 794, 798 (Ct. App. 1975); *In re Pago Pago Aircrash of Jan. 30, 1974*, 525 F. Supp. 1007, 1015–16 (C.D. Cal. 1981); *Cassinos v. Union Oil Co. of Cal.*, 18 Cal. Rptr. 2d 574, 586 (Ct. App. 1993).

The purpose of awarding prejudgment interest is to account for "the accretion of wealth which money or particular property could have produced during a period of loss." *Greater Westchester Homeowners Ass'n*, 26 Cal. 3d at 102–03; *Cassinos*, 18 Cal. Rptr. 2d at 586. Under this principle, California courts have awarded prejudgment interest where injured parties have "been deprived of the use of [their] money or property" during the period between the breach and the judgment. *Nordahl*, 121 Cal. Rptr. at 799; *Cassinos*, 18 Cal. Rptr. 2d at 586; *Bullis*, 21 Cal. 3d at 815; *see In re Pago Pago*, 525 F. Supp. at 1015. Indeed, "[t]he policy underlying authorization of an award of prejudgment interest is to compensate the injured party—to make that party whole for the accrual of wealth which could have been produced during the period of loss." *Cassinos*, 18 Cal. Rptr. 2d at 586.

Therefore, a plaintiff will prevail on a claim for prejudgment interest pursuant to Cal. Civ. Code § 3288 if it can prove (1) the award will "make the plaintiff whole," and (2) the date that the "plaintiff parted with the money or property," to allow the court to accurately calculate interest. *Nordahl*, 121 Cal. Rptr. at 799; *see Bullis*, 21 Cal. 3d. at 815.

Despite this weight of authority, SCVWA argues that it is entitled to prejudgment interest so long as it can show "(1) that its damages included the cost of replacement water and (2) that those damages were 'readily attainable.'" In so arguing, it overlooks the purpose of prejudgment interest— namely, to make the injured party whole. Unlike the plaintiffs in other California cases that have been awarded prejudgment interest, SCVWA has not shown how it has been deprived of the use of its money by purchasing replacement water because it passed those costs onto its customers. As the district court noted, the jury award

included $7 million for past damages, which encompassed damages for past replacement water costs. Accordingly, we hold that the district court did not abuse its discretion by denying SCVWA prejudgment interest on its replacement water costs because it was not necessary to make SCVWA whole.

## H. Attorneys' Fees

Finally, SCVWA challenges the district court's denial of attorneys' fees under California's private attorney general statute, Cal. Civ. Proc. Code § 1021.5. The district court denied fees because it determined, based on the plain language of the statute, that SCVWA is not entitled to attorneys' fees. An appellate court reviews a district court's interpretation of state law de novo. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991). Because the statute precludes SCVWA from receiving attorneys' fees, we affirm.

When a federal court interprets a California statute it applies California canons of construction. *In re Lieberman*, 245 F.3d 1090, 1092 (9th Cir. 2001) (citing *In re Lares*, 188 F.3d 1166, 1168 (9th Cir. 1999)). "Under California law, the cardinal rule of statutory construction is to determine the intent of the legislature." *Id.* To determine the intent of the legislature, a court must be "careful to give the statute's words their plain, commonsense meaning." *Kavanaugh v. W. Sonoma Cnty. Union High Sch. Dist.*, 29 Cal. 4th 911, 919 (2003) (citation omitted). "If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." *Id.* (citation omitted). Accordingly, the

analysis must begin with the statute, which states, in relevant part:

> [A] court may award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit . . . has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by *one public entity against another public entity*, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. *With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor, unless one or more successful parties and one or more opposing parties are public entities*.

Cal. Civ. Proc. Code § 1021.5 (emphasis added).

Here, it is not genuinely contested that SCVWA is a public agency, and Whittaker is a private company. The statute clearly only allows public agencies to get an award of attorneys' fees if they succeed in an action against another public agency. Cal. Civ. Proc. Code § 1021.5. Because the plain language of the private attorney general statute does not allow for an award of attorneys' fees when a public entity is successful in an action against a private entity, we affirm the district court's denial of attorneys' fees.

## <u>CONCLUSION</u>

For the foregoing reasons, we affirm in part, and reverse and remand in part for the district court to amend the judgment consistent with this opinion.

Costs are awarded to the Plaintiff-Appellee.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED with Instructions.**